2001 OK CR 5

**Johnny Dale BLACK, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–1999–249.

Court of Criminal Appeals of Oklahoma.

March 12, 2001.

Rehearing Denied April 9, 2001.

1050

Deborah Maddox, Capital Trial Division, Oklahoma Indigent Defense System, Norman, OK, John Albert, Attorney At Law, Oklahoma City, OK, Attorneys for Appellant at trial.

Robert E. "Gene" Christian, District Attorney, Bret T. Burns, Assistant District Attorney, Stephens County Courthouse, Duncan, OK, Attorneys for the State at trial.

James H. Lockard, Sandra M. Cinnamon, Oklahoma Indigent Defense System, Norman, OK, Attorneys for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## *OPINION*

STRUBHAR, Judge:

¶ 1 Johnny Dale Black, hereinafter Appellant, was convicted of one count of Murder in the first degree (21 O.S.Supp.1997, § 701.7(A)) and one count of Assault and Battery with a Deadly Weapon, After Former Conviction of a Felony (21 O.S.Supp. 1992, § 652), following a jury trial in the District Court of Stephens County,[1] Case No. CF–99–01, the Honorable George W. Lindley, District Judge, presiding. The jury recommended death for the murder after finding four aggravating circumstances [2] and fifteen (15) years imprisonment for assault and battery with a deadly weapon. The trial court sentenced Appellant accordingly. From this Judgment and Sentence, he appeals.[3]

---

1. Although these crimes occurred in neighboring Jefferson County, a change of venue was granted and the trial was held in Stephens County.

2. The aggravators found were: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the defendant knowingly created a great risk of death to more than one person; 3) the murder was especially heinous, atrocious or cruel; and 4) there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, §§ 701.12(1)(2)(4) & (7).

3. Appellant's Petition in Error was filed in this Court on July 21, 1999. Appellant's brief was filed January 3, 2000, and the State's brief was

## FACTS

¶ 2 On January 4, 1998, Cal Shankles went to the trailer home of Jesse Black where Jesse, his brothers Jimmy Black and Appellant, Robert Seale and several others were watching football playoffs. A nervous Shankles wanted the Black brothers and Robert Seale to accompany him while he went to find his brother. Shankles told the Blacks and Seale that he needed them to watch his back because Justin Hightower was looking for him over an affair he had been having with Hightower's soon-to-be ex-wife. Thereafter, Shankles, the Black brothers and Robert Seale left the trailer in Shankles' mother's green Neon with Appellant driving and Shankles on the lookout for Hightower's black Blazer.[4]

¶ 3 Meanwhile, Bill Pogue and his son-in-law, Rick Lewis, drove to Ringling in Pogue's black Blazer to buy some chewing tobacco at a local convenience store. On their way back to Pogue's home, they passed the Neon at an intersection and one of its passengers yelled something at Pogue's Blazer. The Neon turned around and pulled in behind Pogue traveling at a high rate of speed and flashing its lights. Shortly thereafter, the Neon passed Pogue's Blazer and stopped in front of it. It was disputed at trial whether the Neon blocked the roadway.

¶ 4 According to Rick Lewis, the surviving victim, he and Pogue exited the Blazer. Lewis went around the back of the Blazer and came up behind Pogue. The four doors of the Neon opened and Jimmy Black, who was seated in the rear on the driver's side, got out and ran barreling towards them. In response, Pogue hit Jimmy Black in the face and the two began to wrestle towards and into the east bar ditch. Jesse Black and Appellant then ran towards Lewis, who hit Jesse Black, momentarily knocking Jesse down. Lewis was able to sidestep Appellant and throw him into the front of the Blazer.

Appellant and Jesse Black then began fighting with Lewis in the west bar ditch. During the fight, Lewis looked up to see Cal Shankles with some type of club and felt a couple of blows to the head. Lewis did not remember seeing Shankles during the entirety of the fight and the evidence showed Shankles went from bar ditch to bar ditch alternately hitting Lewis and Pogue with some type of club. Lewis remembered seeing Robert Seale standing at the back of the Neon holding what looked like a tree branch, but never saw him fighting with anyone.

¶ 5 After several minutes of fighting, Lewis was able to break free and make his way to the east bar ditch where he saw Pogue on top of Jimmy Black and Appellant over Pogue's back. Lewis pushed Appellant off of Pogue and helped Pogue stand up and head toward the Blazer. Jesse Black then hit Lewis in the side of the head and said "that's for bustin' my lip." The Black brothers, Seale and Shankles then lined up behind the Neon yelling obscenities and taunting Lewis and Pogue. While Lewis assisted Pogue, who had been stabbed eleven times, into the Blazer, the Neon sped away. Although Lewis did not realize it during the fight, Appellant had stabbed him thirteen times with wounds to the back of Lewis' head, spine, chest, side, buttock, leg and arm. After loading Pogue into the Blazer, Lewis raced him back to the Pogue barn, where family members took over and rushed both men to the Healdton hospital. Lewis was treated for his injuries and was later transferred to Ardmore for care. Pogue died at the Healdton hospital.

¶ 6 The morning after the fight Appellant fled to Texas, where he was later apprehended and voluntarily confessed. Jesse and Jimmy Black, Robert Seale and Cal Shankles were also arrested and made voluntary statements.[5] In Appellant's voluntary statement

---

filed May 2, 2000. A reply brief was filed on May 22, 2000. The case was submitted to the Court on May 17, 2000. Oral argument was held September 5, 2000.

4. In Appellant's statement, he says they were looking for Hightower in a black Suburban.

5. Appellant, his brothers Jesse and Jimmy, Cal Shankles and Robert Seale were each charged with first degree murder for the death of Bill Pogue and assault and battery with a deadly weapon. Jesse and Jimmy Black were tried together and were each convicted of the lesser included offenses of first degree misdemeanor manslaughter and assault and battery with a

to police, he claimed he did not go with Shankles to fight, but to see "what the deal was." He claimed he never intended to kill Pogue and he did not understand why Lewis and Pogue attacked his brothers. He maintained he did not remember stabbing Lewis and that he simply reacted because he was afraid for his brothers, Jesse and Jimmy. He claimed when he went to Jimmy's aid, he told Pogue to get off his brother or he would "stab" or "cut" him. When Pogue did not move, he stabbed him. According to Appellant, he and Pogue began to wrestle and roll around and Pogue kept rolling onto the knife. He maintained there was no intent to kill anyone and that his brothers did not know he used his knife. Other facts will be discussed as they become relevant to the propositions of error raised for review.

## PRE–TRIAL ISSUES

¶ 7 In his twelfth proposition of error, Appellant claims he was denied due process of law when he was convicted of a greater offense than for which he was bound over at preliminary hearing. He maintains he was bound over on a charge of assault and battery with a dangerous weapon, but tried and convicted of the greater crime of assault and battery with a deadly weapon. Appellant never objected on these grounds.

¶ 8 The record shows Appellant was originally charged with assault and battery with a deadly weapon. At the beginning of preliminary hearing, the magistrate announced that each defendant was charged with first degree murder and assault and battery with a deadly weapon, which was confirmed by the District Attorney. At the conclusion of the preliminary hearing, the magistrate reviewed the evidence and ruled:

Upon those findings, the Court is compelled to bind over each of these Defendants and everyone of these Defendants in relation to each of the two charges that are charged against each of these Defendants. (P.Hrg. 832)

¶ 9 Thereafter, the District Attorney clarified the magistrate's ruling and reminded the magistrate that as to Appellant the "bind over should reflect as to the assault and battery with a deadly weapon that he also be bound over with one prior Felony conviction." The magistrate ruled accordingly. That same day, the magistrate entered a written order entitled "Transcript of Examining Magistrate" in which he listed the crime charged as well as the crime for which the defendants were bound over as assault and battery with a dangerous weapon. Given the record of preliminary hearing and the fact the crime was misstated in both places on the written order, we find that the written order contains a scrivenor's error and that the record shows Appellant was bound over on a charge of assault and battery with a deadly weapon. As such Appellant was not denied due process and was tried on the appropriate charge for which he was bound over. Accordingly, no relief is required.

¶ 10 In his sixteenth proposition of error, Appellant claims his right to have an impartial magistrate preside at his preliminary hearing was denied. Prior to the hearing, Appellant unsuccessfully moved to disqualify the magistrate on grounds he had issued the search warrants and arrest warrants in this case. Appellant asserts that because the magistrate must have necessarily found probable cause in order to issue the warrants, the magistrate was unfairly predisposed to find probable cause at the preliminary hearing. Appellant claims this alleged error requires relief and asks this Court to reverse his conviction and remand this case for a proper preliminary hearing in front of an impartial magistrate.

¶ 11 Every person is entitled to have an impartial judge preside over his case. Okla. Const. art. 2, § 6. A judge who is

dangerous weapon. Each received a sentence of 25 years imprisonment for manslaughter and 7 years imprisonment for assault and battery with a dangerous weapon. Cal Shankles plead guilty to first degree murder and assault and battery with a deadly weapon and received a life sentence for murder and 20 years imprisonment with 10 suspended for assault and battery with a deadly weapon. Robert Seale plead guilty to first degree misdemeanor manslaughter and received a sentence of 16 years imprisonment with 12 years suspended.

interested in the cause or proceedings or the result thereof is disqualified to preside. 20 O.S.1991, § 1401. Rulings on motions to disqualify are within the sound discretion of the district courts and are reversed only where there has been a clear abuse of discretion. *Nguyen v. State*, 1992 OK CR 81, ¶ 19, 844 P.2d 176, 181, *cert. denied*, 509 U.S. 908, 113 S.Ct. 3006, 125 L.Ed.2d 697 (1993). Abuse of discretion has occurred where the trial judge's actions showed actual prejudice against the accused or the judge became intertwined in the case due to personal relationships. *See Fitzgerald v. State*, 1998 OK CR 68, ¶ 10, 972 P.2d 1157, 1163.

¶ 12 In the present case, neither Appellant's brief nor a review of the record reveals any particular instances of prejudice by the magistrate toward Appellant or that the magistrate became intertwined in the case due to some personal relationship with one of the parties. Nonetheless, Appellant would have this Court accept the argument that if a judge signs the search/arrest warrants in a case, that judge is necessarily biased/interested in the subsequent preliminary hearing.

¶ 13 We have reviewed our case law and have found no case directly on point. However, this Court has consistently allowed a judge who issues an order of contempt to preside over the contempt hearing, absent some evidence that his conduct is so intertwined in the contempt as to compromise his impartiality. *See Zeigler v. State*, 1991 OK CR 25, ¶ 7, 806 P.2d 1131, 1133–34. We believe the circumstances presented in the instant case is akin to the contempt citation. As such, we find that the act of signing search and arrest warrants does not constitute the type of interest in a proceeding that would automatically prohibit the issuing judge from presiding at the subsequent preliminary hearing absent some evidence that

his conduct is somehow intertwined in the issuance of the warrants as to compromise his impartiality. *See* 20 O.S.1991, § 1401. Here, there was no such evidence. Accordingly, this proposition is denied.

## ISSUES RELATED TO JURY SELECTION

¶ 14 In his seventh proposition of error, Appellant claims he was denied his right to select a fair and impartial jury due to the trial court's restrictive *voir dire* process. He claims these restrictions included being denied juror questionnaires, access to the district attorney's criminal history records of potential jurors, inquiry into the jurors' states of mind regarding Appellant's defense and a meaningful question and answer process.

¶ 15 "The purpose of *voir dire* examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges." *Patton v. State*, 1998 OK CR 66, ¶ 9, 973 P.2d 270, 280, *cert. denied*, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). The manner and extent of questioning is within the discretion of the trial court whose rulings will not be disturbed on appeal absent a clear abuse of discretion. *Id.* It is the trial court's prerogative to restrict questions that are repetitive, irrelevant or in regard to legal issues upon which the trial court will instruct the jury. *Id.* No abuse of discretion will be found so long as the *voir dire* questioning is broad enough to afford the defendant a jury free of outside influence, bias or personal interest. *Id.*

¶ 16 During jury selection, the trial court conducted the initial questioning of the prospective jurors seated [6] and then allowed the

---

**6.** The trial court initially seated 12 prospective jurors in the jury box and 24 prospective jurors in the first four rows of the gallery. The trial court asked prospective jurors whether their exposure to pre-trial publicity and any opinion they had formed affected their ability to base their verdict on the evidence presented in court, whether they knew or were related to the defendants, the victims, the lawyers or the witnesses, whether the prospective jurors or members of their immediate family had ever been the victims

of crime or been involved in a criminal case, whether the prospective jurors would give Appellant the presumption of innocence, whether any of the prospective jurors or their relatives were employed in law enforcement of any kind, whether the prospective jurors had prior jury service, whether the prospective jurors had any religious or philosophical beliefs that would prevent them from sitting in judgment of another, whether the prospective jurors had any personal business that would prevent them from giving the case the

prosecutor and defense counsel to question the prospective jurors as a panel and individually. There is no evidence to support Appellant's contention that he was not provided with the jury questionnaires. During a pre-trial motion hearing, defense counsel urged the trial court to adopt a jury questionnaire that she had utilized in the past. The trial court noted that it, too, had a questionnaire that it had used. At the conclusion of the hearing, defense counsel was to provide the court with a copy of her proposed questionnaire and the trial court would rule after reviewing it. It is clear some type of questionnaire was used as no questions were asked during *voir dire* concerning basic information generally provided on a questionnaire, such as prospective jurors' addresses, occupations and family status. The District Attorney also referenced the questionnaires during his questioning. However, a copy of the questionnaire was not made a part of the record for review. Nonetheless, at no time did defense counsel object or state that she did not receive copies of the prospective jurors' questionnaires or that she was without basic information concerning the panel. As such, this portion of Appellant's claim must fail.

¶ 17 Next, Appellant complains he was not able to adequately participate in the jury selection process because he was not provided with the district attorney's criminal history information of potential jurors. Appellant filed a pre-trial motion requesting the district attorney's jury list. At a pre-trial motion hearing, the district attorney objected to providing his list, maintaining the criminal background information was a matter of public record that defense counsel could obtain. Defense counsel countered that she did not have access to police computers to obtain such information. The trial court overruled Appellant's request.

¶ 18 During *voir dire*, the trial court asked prospective jurors if they had ever been accused of a crime or been a participant in a criminal case in any manner. Following the trial court's inquiry, the State talked with a prospective juror who had not initially responded about prior convictions/accusations but who wanted to clarify his prior record of DUI's. The State also asked the panel again if anyone had been a defendant in a criminal case. Although the defense chose not to do so, there is nothing to show the defense was not free to expound on this inquiry during its questioning so as to further educate itself about the panel. Because Appellant was not prohibited from such questioning, we cannot find the trial court abused its discretion in overruling Appellant's request for the district attorney's juror list or that the *voir dire* process was unfair.

¶ 19 Third, Appellant complains that he was not allowed to inquire into the prospective jurors' states of mind concerning his heat of passion manslaughter defense. *See* 22 O.S.1991, § 659. In *Jackson v. State,* 1998 OK CR 39, ¶ 12, 964 P.2d 875, 883, *cert. denied,* 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999), we held the trial court did not abuse its discretion in disallowing Jackson's questions regarding his theory of defense because the questions were an effort to test jurors' willingness to accept his theory of defense rather than to test their impartiality. The same is true in the instant case. Defense counsel told the prospective jurors that her client killed Pogue and the issue for the jury to decide was whether he did so with malice aforethought or in a heat of passion. When counsel attempted to ask questions dealing specifically with the facts of this case or to give hypotheticals based on the facts of this case, the trial court properly sustained the State's objections.

¶ 20 The record further shows defense counsel was allowed sufficient *voir dire* to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise peremptory challenges. *Jackson,* 1998 OK CR 39, at ¶ 11, 964 P.2d at 883. Despite the trial court's rulings on several questions propounded by defense counsel to test jurors' willingness to accept the defense, counsel did ask jurors if they could envision circumstances/reasons why one might take another person's life and whether they would

attention it deserved given its expected length and whether the prospective jurors could consider the three possible penalties for murder in the first degree.

take such circumstances into consideration in determining guilt or innocence and sentence. Defense counsel also questioned prospective jurors to test whether they were open to listening to both sides of the case and confirmed that the prospective jurors wanted as much information as possible before rendering a verdict. Because defense counsel was allowed to probe the jurors' states of mind regarding their impartiality to listen to all the evidence and weigh such pursuant to the instructions of the court, we find the trial court did not abuse its discretion in limiting the defense's inquiry regarding the specifics of its heat of passion manslaughter defense.

■■■ ¶21 Lastly, Appellant claims he was denied a "viable" question and answer process. *See Appellant's Brief* at 39. Appellant cites defense counsel's objections to the trial court's inquiry concerning pre-trial publicity to support his claim. During the trial court's initial questioning, it asked prospective jurors if they had been exposed to any pre-trial publicity concerning this case through any sort of medium. Any juror who indicated that they knew something of the case was questioned to determine if they could set aside any preconceived opinion and rely solely on the evidence admitted at trial. Several prospective jurors said they could not and they were excused for cause. The remaining jurors advised the trial court that they could base their verdict on the evidence admitted rather than on any outside source.[7] Defense counsel was also allowed to question the jurors about pre-trial publicity. She told prospective jurors that if they had remembered any exposure to pre-trial publicity during the questioning that they had not shared, they had a duty to disclose such information and could do so during her questioning. Based on this record, we find the trial court did not abuse its discretion and that Appellant was sufficiently allowed to question jurors about pre-trial publicity.

■■■ ¶22 Appellant also claims he was denied a meaningful question and answer process because the trial court did not allow defense counsel to question jurors after the panel was passed for cause and the parties began to exercise their peremptory challenges. Counsel told the trial court the defense believed they would be given another opportunity to talk with jurors individually who moved from the gallery to the jury box. The trial court refused to allow further questioning and took a recess to discuss the trial court's procedure with defense counsel. Following the recess, the remaining peremptory challenges were exercised.

¶23 As discussed above, the trial court conducted the initial questioning in which it questioned the jurors seated in the jury box and then the jurors in the gallery. The State and defense followed this procedure as well. Defense counsel chose to focus the majority of her questioning on the jurors seated in the jury box. Towards the end of her questioning, she directed questions to jurors in the gallery and talked with approximately eight of those jurors individually. This record shows defense counsel was given the opportunity to question all prospective jurors individually. However, it also shows that counsel was not familiar with the jury selection method employed in Stephens County, which the trial court acknowledged could be confusing. As the test is whether defense counsel was allowed sufficient *voir dire* to intelligently exercise peremptory challenges, this Court must decide if the court's ruling prohibiting counsel from asking additional questions of gallery jurors who moved to the jury box prevented the intelligent exercise of peremptory challenges. As the State points out, Appellant provides no specific example of any seated juror who was biased or otherwise could not perform their duty as a juror. Nor does Appellant identify jurors he would have stricken with a peremptory. Based on this record, we cannot find the trial court abused its discretion or that the jury selection pro-

---

7. Counsel complained that several jurors only stated that they "thought" they could set aside preconceived opinions derived from pre-trial publicity. (Tr. 35) The trial court noted that it was satisfied from the prospective jurors' answers coupled with their facial expressions that these jurors indicated that they could set aside what they had heard or read and arrive at a fair verdict. (Tr. 36) Because the trial court was satisfied that the jurors could be fair, it denied defense counsel's renewed request for individual *voir dire*, but agreed to be more inquisitive for defense counsel. (Tr. 37)

cess was not constitutionally adequate. However, we admonish trial courts to favor leniency when misunderstandings as to *voir dire* procedure arise, especially in capital cases.

¶ 24 In his eighth proposition of error, Appellant argues the trial court improperly excused four potential jurors for cause based on their opposition to the death penalty. He maintains defense counsel should have had the opportunity to question or rehabilitate these prospective jurors to determine if they could set aside their personal objections and follow the law and the court's instructions. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

¶ 25 "This Court has consistently held the decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown." *Washington v. State,* 1999 OK CR 22, ¶ 9, 989 P.2d 960, 967. The trial court should remove for cause jurors who would automatically vote either for or against the death penalty because they will necessarily fail to consider all the evidence presented in aggravation and mitigation. *See Fitzgerald v. State,* 1998 OK CR 68, ¶ 31, 972 P.2d 1157, 1170. In reviewing the *voir dire* examination of potential jurors who were unclear or equivocal about their ability to consider the death penalty, "this Court traditionally defers to the impressions of the trial court who can better assess whether a potential juror would be unable to fulfill his or her oath." *Washington,* 1999 OK CR 22, at ¶ 9, 989 P.2d at 967. However, "[r]emoval for cause of even one venire member who has conscientious scruples against the death penalty but is nevertheless able to set aside those scruples and consider the penalty of death and is therefore eligible to serve on the jury is error of constitutional magnitude not subject to harmless error analysis." *Scott v. State,* 1995 OK CR 14, ¶ 10, 891 P.2d 1283, 1289, *cert. denied,* 516 U.S. 1077, 116 S.Ct. 784, 133 L.Ed.2d 735 (1996) (*citing Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622, 638 (1987)).

¶ 26 During *voir dire,* the trial court advised prospective jurors there were three possible punishments for a conviction of first degree murder: life, life without parole and death. The trial court then asked the prospective jurors if they could consider all three of the possible punishments and impose the punishment warranted by the law and the evidence. Three of the prospective jurors about whom Appellant complains (Skiles, Adams, Richard) responded they could not consider the death penalty regardless of the facts and law. When, as here, prospective jurors advise that they cannot consider the death penalty regardless of the facts, the circumstances or the law, the prospective jurors are advising the trial court they cannot put aside their beliefs and follow the law and the court's instructions. As such, they are properly removed for cause. *See Washington,* 1999 OK CR 22, at ¶ 10, 989 P.2d at 968; *Douglas v. State,* 1997 OK CR 79, ¶ 8, 951 P.2d 651, 660, *cert. denied,* 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998). Accordingly, we find the trial court did not err in excusing these prospective jurors for cause without further inquiry following their unequivocal responses. *Douglas,* 1997 OK CR 79, at ¶ 8, 951 P.2d at 659–60.

¶ 27 Appellant also complains about the removal for cause of prospective juror Williams based on her opposition to the death penalty. Williams told the trial court that she did not "think" she could give the death penalty. The trial court asked if the law and evidence permitted, were Williams' reservations about the death penalty such that regardless of the law, facts and circumstances she would not consider imposing the death penalty. To this question, Williams stated, "No sir." The trial court excused Williams without any further inquiry. Defense counsel objected and asked the trial court for the opportunity to rehabilitate her. The trial court denied this request. *See Brown v. State,* 1998 OK CR 77, ¶ 27, 989 P.2d 913, 923 (holding trial court is not required to allow the parties to rehabilitate potential jurors).

¶ 28 Although a literal reading of Williams' answer indicated that she may be able to consider the death penalty, the parties understood otherwise. During counsel's argument to rehabilitate Williams, the trial court stated he asked Williams if she could consider imposing the death penalty and she said no. Counsel agreed, but argued Williams needed more information to definitively decide. In denying counsel's request to rehabilitate and provide more information, the trial court stated that jurors who cannot consider the death penalty are "indicating they cannot follow the Instructions of the Court." A review of the transcript reveals all parties present understood Williams meant she could not impose the death penalty. Based on this record, we defer to the trial court and find no abuse of discretion in dismissing Williams for cause. Accordingly, we find the trial court did not err in removing any of the complained-of prospective jurors for cause and no relief is warranted.

¶ 29 Lastly, Appellant contends the trial court failed to and prevented defense counsel from "life-qualifying" prospective jurors.[8] The record does not support Appellant's claim. Nowhere in the record did defense counsel request the trial court to life-qualify the jury. Nor was defense counsel prevented from life-qualifying the jury. Appellant cites to defense counsel's argument in which she refers to *Morgan v. Illinois.* However, counsel was not arguing about life-qualifying the jury; rather, she was arguing she had the duty to inquire about the jurors' states of mind concerning the heat of passion manslaughter defense. Furthermore, the record shows both the trial court and defense counsel asked questions to ensure that the prospective jurors would consider all three penalties and would not automatically vote for any punishment. As such, no *Morgan* error occurred. *See Cannon v. State,* 1998 OK CR 28, ¶ 7, 961 P.2d 838, 844.

¶ 30 In his ninth proposition of error, Appellant contends the prosecutor im-

properly used a peremptory challenge to remove a minority juror from the panel and that the removal was motivated by racial considerations in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

¶ 31 We recently reiterated the applicable analysis for *Batson* claims:

> *Batson* establishes a three (3) part analysis: 1) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; 2) after the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation related to the case for striking the juror in question; and 3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. As for the second requirement, the Supreme Court noted the race-neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. The trial court's findings as to discriminatory intent are entitled to great deference. Our review is only for clear error by the trial court, and we review the record in the light most favorable to the trial court's ruling.

*Short v. State,* 1999 OK CR 15, ¶ 12, 980 P.2d 1081, 1091, *cert. denied,* 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000) (citations omitted).

¶ 32 The prosecutor in this case removed prospective juror Castle because Castle failed to disclose he had been accused of first degree burglary that was later dismissed and refiled as misdemeanor assault and battery. The record shows Castle did not respond when the panel was asked if they had been accused or involved in a criminal matter.[9] The record further shows the

8. Life-qualifying a jury is the questioning process that identifies and excludes potential jurors who would automatically impose the death penalty and be unable to return a sentence of life imprisonment or life imprisonment without parole upon a finding of guilt for First Degree Murder.

*See Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

9. At trial, defense counsel argued the jurors were confused about the need to disclose misdemeanor convictions and that she was entitled to the

prosecutor removed a white juror who belatedly disclosed his prior misdemeanor criminal record. As we stated in *Short*, 1999 OK CR 15, at ¶ 15, 980 P.2d at 1092, excusal of a potential juror because of a prior criminal record is a legitimate reason for removal. Here, the trial court accepted the prosecutor's race-neutral explanation for striking Castle and rejected Appellant's assertion that the reasons were pretextual. Because the trial court's ruling upholding the challenge is supported by the record and not clearly erroneous, we find no *Batson* error.[10]

## FIRST STAGE ISSUES

¶ 33 In his first proposition of error, Appellant claims his murder conviction must be reversed because the trial evidence was insufficient to prove beyond a reasonable doubt that he intended to kill Bill Pogue. Appellant maintains the State was bound by his statement that he never intended to kill Pogue because the State's evidence failed to rebut his admissions and that, at most, he is guilty of heat of passion manslaughter. He argues the facts that he did not know the victims were seriously injured after the fight, the absence of any previous animosity between the victims and himself and that the victims were alive and able to go to the police and identify him demonstrate that he did not intend to kill Pogue and that he acted in a heat of passion.

¶ 34 We review sufficiency of the evidence claims by viewing the trial evidence in the light most favorable to the State and asking whether a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. This Court will not disturb a jury verdict where there is sufficient evidence to support it, as it is the jury's exclusive province to weigh the evidence and determine the facts. *Torres v. State*, 1998 OK CR 40, ¶ 38, 962 P.2d 3, 16, *cert. denied*, 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999). If the State introduces a defendant's exculpatory statement which, if true, would entitle the defendant to acquittal, he must be acquitted unless the statement has been disproved or shown to be false by other direct or circumstantial evidence in the case. *Cannon v. State*, 1995 OK CR 45, ¶ 34, 904 P.2d 89, 103, *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996).

¶ 35 Direct evidence of intent to commit crimes is oftentimes lacking leaving juries to rely on circumstantial evidence to determine the purpose with which a person acted. *Freeman v. State*, 1994 OK CR 37, ¶ 11, 876 P.2d 283, 287, *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). To prove the mental state malice aforethought, the State must show the defendant acted with a deliberate intention to take the life of another without justification. *Jackson v. State*, 1998 OK CR 39, ¶ 24, 964 P.2d 875, 885, *cert. denied*, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999); *Huckaby v. State*, 1990 OK CR 84, ¶ 22, 804 P.2d 447, 452. This intent may be "formed instantly before committing the act by which it is carried into execution." 21 O.S.1991, § 703. Further, the law infers a design to effect death from the fact of killing unless the

district attorney's jury list. As stated in Proposition VII, nothing in the record shows defense counsel was prohibited from expounding on the questions concerning prospective jurors' prior criminal records.

10. In conjunction with this appeal, Appellant filed an "Application for Evidentiary Hearing on Jury Issues" pursuant to Rule 2.1(A)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1999) and 12 O.S.1991, § 2606(B). Contained therein is an O.S.B.I. criminal background check on one of the white jurors who served on Appellant's jury showing the juror had a prior Driving While Impaired conviction that the juror did not disclose during jury selection. Because the prosecutor did not strike this white

juror for failing to disclose his prior record, Appellant maintains this shows Castle's strike was pretextual or that the prosecutor only performed criminal background checks on minority jurors. *Batson* is not violated "whenever prospective jurors of different races provide similar responses and one is excused while the other is not." *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir.1994), *cert. denied*, 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995). *Batson* requires a race neutral explanation which was provided in this case. The prosecutor excused both a black and a white juror with criminal records. We do not find an evidentiary hearing is warranted based on the application presented. As such, the request is denied.

circumstances raise a reasonable doubt that such design existed. 21 O.S.1991, § 702.

¶ 36 Contrary to Appellant's assertion, the direct and circumstantial evidence presented at trial was sufficient for a rational trier of fact to conclude Appellant intended to kill Bill Pogue when he stabbed him eleven times, his statements notwithstanding. The evidence showed Cal Shankles arrived at Jesse Black's trailer where he had a private back-room conversation with Appellant and his brothers presumably advising them of his current difficulties with Justin Hightower. Shankles and the Blacks left shortly thereafter for approximately 15 to 20 minutes and returned for another private back-room discussion. Thereafter, they and Seales left in search of Justin Hightower where a fight of some kind was likely and anticipated as the evidence showed Shankles had been looking for others to help him fight Hightower as well as for weapons to use in such fight.[11] Appellant voluntarily accompanied Shankles to the arranged confrontation armed with his knife.[12]

¶ 37 When the defendants encountered the victims who Shankles wrongly identified as the men looking for him, Appellant intentionally followed Pogue's Blazer. Even though Appellant claimed that it appeared the two victims kept reaching down like they were loading guns, Appellant chose to pull in front of the Blazer and force it to stop, rather than avoid a fight with armed men. Knowing about fighting and guns, Appellant said he knew someone was going to get hurt. Without pause after the cars stopped, Jimmy and Jesse Black jumped out and rushed Lewis and Pogue in a threatening manner demonstrating a group intent to, at the very least, fight the Blazer occupants. Appellant immediately followed Jesse and joined in a fight with Lewis where Appellant quickly pulled out his knife stabbing Lewis thirteen times with wounds to the head and chest. Al-though Appellant claimed he acted out of fear for his and Jesse's safety, the evidence showed Lewis was fighting with three men at the time Appellant stabbed him. Given this ratio, a jury could disbelieve Appellant's statement that he acted out of fear.

¶ 38 Although Appellant claimed he then went to Jimmy's aid, his account of his encounter with Pogue was contradicted by his brother Jimmy. Appellant claimed Pogue failed to respond to his warning to let Jimmy go or be stabbed. Appellant said he and Pogue "locked up" rolling on the ground while Shankles hit Pogue with the club. Appellant claimed Pogue kept rolling onto the knife and refused to let go until someone said, "let him go or we're going to kill you." Jimmy, on the other hand, testified Pogue was holding him down when Appellant stood over Pogue's shoulder. Jimmy further testified he never saw Appellant and Pogue rolling on the ground. A jury could easily disbelieve Appellant's account that Pogue sustained some eleven stab wounds, several penetrating his lungs, by repeatedly rolling onto the knife. Further, because the lighting was good enough for Lewis to identify the defendants and accurately testify to their actions, the jury could infer Appellant would have been able to see Jimmy was not being seriously injured thereby refuting Appellant's statement. In addition, the physical injuries sustained by the Blacks belie Appellant's claim that he acted out of a fear for the safety of his brothers and himself as none of them were seriously injured. The physical injuries sustained by the victims corroborate that they were not in control of the fight. The jury could also infer a consciousness of guilt on behalf of Appellant because he threw his knife into a nearby lake and fled the morning after the fight knowing, at the very least, Pogue had been seriously injured. Because Appellant went

11. Llewyellyn Brooks testified Shankles came by and asked Brooks to help him beat up some guy from Ardmore. When Brooks refused, Shankles left. Shankles returned in approximately 30 minutes to an hour and asked Brooks if he had a club Shankles could borrow. Brooks testified he told Shankles no, but noted he had a shovel handle in the back of his pick-up truck. He did not notice if it was missing after Shankles left.

Brooks also did not see if Shankles was with anyone. However, the time frame outlined by Brooks would allow the jury to infer that Shankles was with the Blacks during his second visit when Shankles was in search of a club.

12. Justin Hightower testified that he had agreed to meet Shankles the evening of January 4, 1998.

armed to an arranged confrontation and stabbed the victims numerous times in vital areas, a rational jury could find Appellant knew and intended the natural consequences of these acts, that being the death of those he stabbed regardless of his statements to the contrary.

¶ 39 Next, Appellant claims that even if the evidence supports a finding of intent to kill, the evidence failed to prove the killing was the result of a deliberate intent rather than in a heat of passion.[13] As part of this claim he asks this Court to reconsider its previous decisions holding that heat of passion manslaughter requires the killing to be both in a heat of passion and without a design to effect death. Without addressing the merits of Appellant's claim, the State simply responds the statutory language requires the homicide be perpetrated without a design to effect death. 21 O.S.1991, § 711(2).

¶ 40 Appellant asserts this Court has been inconsistent in its rulings on whether a defendant can commit heat of passion manslaughter if the defendant intended to kill. *Compare Walker v. State,* 1986 OK CR 116, ¶ 38, 723 P.2d 273, 284, *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986) (stating "[t]he heat of passion must render the mind incapable of forming a design to effect death before the defense of manslaughter is established;") *Morgan v. State,* 1975 OK CR 89, ¶ 3, 536 P.2d 952, 960–61, *overruled on other grounds by Walton v. State,* 1987 OK CR 227, ¶ 9, 744 P.2d 977, 978–979. (Brett, P.J. concurring in result)(stating "It is not enough under the law of Oklahoma that it be shown that the intent to kill was formed as the result of a reasonable passion, the passion must be so great as to destroy any intent to kill and indeed render the mind incapable of forming an intent.") *with Morgan,* 1975 OK CR 89 at ¶ 2, 536 P.2d at 959–60 (appendix)(heat of passion manslaughter is the unlawful and intentional killing of another under the influence of a sudden heat of passion caused by adequate provocation and without malice); OUJI–CR2d 4–95.

¶ 41 After reviewing the authorities cited by Appellant, it is difficult to see how reconciling these cases affects Appellant's case. Had Appellant's jury been instructed that it had to find Appellant acted without a design to effect death or the trial court refused to administer manslaughter instructions simply because it found Appellant acted intentionally, resolution of this issue would be relevant. However, despite the statutory language that the homicide be "perpetrated without a design to effect death" in order to constitute first degree manslaughter, such was not included as an element in the uniform jury instructions administered in this case. Rather, the jury was instructed the State had to prove beyond a reasonable doubt: 1) the death of a human; 2) the death was not excusable or justifiable; 3) inflicted by means of a dangerous weapon; 4) caused by the defendant; 5) when performing the conduct which caused the death, defendant was in a heat of passion. *See* OUJI–CR2d 4–96; O.R. at 80. A review of the evidence outlined above shows the trial evidence was sufficient to disprove heat of passion manslaughter beyond a reasonable doubt and allow a rational trier of fact to find Appellant was neither adequately provoked nor acting in a heat of passion sufficient to negate malice. Accordingly, we find this proposition is without merit.

¶ 42 In his second proposition, Appellant claims the trial court's heat of passion manslaughter instructions were constitutionally deficient because they failed to inform the jury: 1) that Appellant's defense was heat of passion; 2) that it was the State's burden to prove the absence of heat of passion in order to convict Appellant of murder; and 3) that heat of passion manslaughter should be considered in tandem with the charged crime of murder. *United States v. Lofton,* 776 F.2d 918 (10th Cir.1985). Be-

---

13. Appellant maintains that premeditation is a component of malice aforethought arguing the use of the "qualifier *deliberate* before the requisite mental state of intent to kill carries forward the age-old requirement of premeditation." *See Appellant's Brief* at 13. To act premeditatedly

simply means "thought of beforehand for any length of time, however short." *Black's Law Dictionary* (5th ed.1983). This definition is consistent with our interpretation of malice aforethought and explains why such term appears throughout this Court's opinions over the years.

cause Appellant failed to object to the trial court's heat of passion manslaughter instructions, we will review for plain error. *Cannon v. State*, 1998 OK CR 28, ¶ 34, 961 P.2d 838, 849.

¶ 43 Throughout the trial Appellant never disputed that he stabbed Pogue; rather, he sought to prove that he lacked the malice aforethought necessary to make his act murder because he was acting under a heat of passion.[14] With defense counsel's consent, the trial court administered the uniform instructions on the lesser included charge of Manslaughter in the First Degree. The problem presented here involves the situation where a defendant asserts the lesser included offense of manslaughter not simply as an alternative to the charge of murder, but as an affirmative defense to the crime charged by the State.

¶ 44 Appellant relies on *Lofton*, 776 F.2d at 920, in which the Tenth Circuit held that a "defendant in a federal murder case who has sufficiently raised a heat of passion defense is entitled to instructions informing the jury of the theory of the defense and of the Government's duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a murder conviction." In so holding, the *Lofton* court relied on and expanded the holding of *Mullaney v. Wilbur*, 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975). In *Mullaney*, the Supreme Court reviewed a Maine statute that required the defendant to prove he acted in the heat of passion in order to be punished for manslaughter to determine if such statute was constitutional. The *Mullaney* Court held "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." [15]

¶ 45 Based on its reading of *Mullaney*, the *Lofton* court reviewed the given jury instructions as a whole to see if they sufficiently advised the jury of Lofton's defense and its effect on the prosecution's burden of proof. *Id.* at 920–21. After analysis of the instructions, the Court found the instructions deficient. Although the crimes of First Degree Murder and Manslaughter were properly defined for the jury, other instructions limited the jury's consideration of manslaughter as a defense and precluded the jury from considering the effect of the heat of passion evidence until after it determined that the crime of murder had not been proved. *Id.* at 921–22. The court held the structure of the jury charge coupled with the facts that the jury was not instructed that "heat of passion" was Lofton's only defense to the crime and that the State had the burden to disprove same constituted "plain error" requiring relief.

¶ 46 However, the Tenth Circuit has since addressed and distinguished *Lofton* in an Oklahoma case involving these same two crimes. *See Davis v. Maynard*, 869 F.2d 1401 (10th Cir.1989), *cert. granted and judgment vacated, Saffle v. Davis*, 494 U.S. 1050, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990), *on remand Davis v. Maynard*, 911 F.2d 415 (10th Cir.1990). In *Davis*, the defendant's sole defense at trial was self-defense. Al-

---

14. Although the trial court administered correct self-defense instructions, Appellant's primary defense was heat of passion manslaughter making the cases cited by the State unhelpful. During *voir dire*, defense counsel advised jurors they had to decide if Appellant killed Pogue with malice aforethought or in a heat of passion. (Tr. 112) During closing argument, defense counsel said, "I'm not going to talk to you about self-defense. We've never talked to you about self-defense." (Tr. 747) Later, counsel stated, "Johnny Black has offered this Jury a plea of guilty to manslaughter ..." (Tr. 758) "Manslaughter conviction and a Manslaughter sentence is not a day in the park ... Finding him guilty of manslaughter, which is what he did and confessed to, why wouldn't that be enough? Why is the State so afraid to punish Johnny Black for what he did? Why? We wouldn't be here today. He—Mr.

Black was more than happy to plead guilty to Manslaughter." (Tr. 761)

15. The Fifth Circuit has found that *Lofton* went too far in making the prosecution prove the absence of heat of passion when the element of malice is neither presumed nor required to be disproved by the defendant. It interprets *Mullaney* as holding only that an element of a crime may not be presumed and that a burden may not be imposed upon a criminal defendant to disprove an element of a crime. *See U.S. v. Molina–Uribe*, 853 F.2d 1193, 1204 (5th Cir.1988), *cert. denied*, 489 U.S. 1022, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989), *overruled on other grounds by, U.S. v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991).

though the trial court administered instructions on heat of passion manslaughter, in addition to first degree murder and self-defense, the trial court specifically instructed the jury that malice and heat of passion could not co-exist. After reviewing the instructions defining the differing *mens rea* requirements of murder and manslaughter, the *Davis* court specifically found that the instructions in *Davis*, unlike those in *Lofton*, "explicitly defined malice and heat of passion as mutually exclusive" meaning "the jury's finding of malice necessarily implies the absence of heat of passion." *Davis*, 869 F.2d at 1406–07. Therefore, the court held "where the defense [of heat of passion manslaughter] is not squarely raised and the instructions properly define the differing mental states, the jury need not be instructed specifically that the prosecution must prove the absence of heat of passion when the element of malice is neither presumed nor required to be disproved by the defendant." *Id.* at 1407.

¶ 47 In *McCormick v. State*, 1993 OK CR 6, ¶ 28, 845 P.2d 896, 901, this Court, relying on *Davis*, held the trial court did not err in failing to instruct the jury of the State's burden to disprove McCormick's heat of passion manslaughter defense because the instructions as a whole sufficiently did so. The jury was instructed that to convict McCormick of first degree murder, the State had to prove beyond a reasonable doubt "the death was caused with malice aforethought" and that malice aforethought was "a deliberate intention to take away the life of a human being." *McCormick*, 1993 OK CR 6, at ¶ 23, 845 P.2d at 900. To convict McCormick of manslaughter, the State had to prove beyond a reasonable doubt that the "Defendant was in a heat of passion and said act was perpetrated without a design to effect death." *Id.*, 1993 OK CR 6, at ¶ 24, 845 P.2d at 900. We found the manslaughter "instruction expressly indicated that the jury must find an absolute lack of premeditation in order to find [McCormick] guilty of this crime." *Id.* We further found the language used by the trial court in the murder and manslaughter instructions was unequivocal; a murder conviction required proof of a deliberate intent to

kill while manslaughter should be found if the killing was done without a design to effect death. *Id.*, 1993 OK CR 6, at ¶ 26, 845 P.2d at 901. In addition, unlike *Lofton*, the instructions indicated to the jury that proof of the two crimes should be examined together rather than individually and that the jury was not precluded from consideration of the lesser included crime until the greater crime was eliminated as an option. *Id.*, 1993 OK CR 6, at ¶ 27, 845 P.2d at 901.

¶ 48 The instructions administered in the instant case were the uniform instructions. As in *Lofton*, heat of passion manslaughter was submitted as a lesser included offense and the jury was instructed to consider heat of passion manslaughter if it found the State had failed to prove murder beyond a reasonable doubt. Nowhere in the instructions was the jury advised that heat of passion manslaughter was Appellant's defense or that the State had the burden to disprove heat of passion beyond a reasonable doubt. However, unlike *Lofton*, the definition of malice in Oklahoma's uniform instructions is much more specific than the federal instruction. Under Oklahoma law, malice is a deliberate intention to take away the life of a human being (21 O.S.Supp.1997, § 701.7(A)) while in *Lofton* malice was defined as "but another name for a certain state or condition of a person's mind or heart." *Lofton*, 776 F.2d at 922, n. 2. Heat of passion is defined similarly in both the Oklahoma and federal instructions. The use of "deliberate intent" in the definition of malice in Oklahoma connotes an intent that is thought out or considered before commission of the fatal act,[16] rather than some undefined condition of the mind or heart. Because heat of passion requires the defendant to act on the force of a strong emotion following adequate provocation that would naturally affect the ability to reason and render the mind incapable of cool reflection, i.e., not with a deliberate intent preformed, the Oklahoma definitions of malice and heat of passion show they cannot co-exist. Although the instructions in the instant case do not specifically state these mental states cannot co-exist as in *Davis*, the definitions employed to define the mental

---

**16.** *See Black's Law Dictionary*, (5th ed.1983).

states of murder and heat of passion manslaughter sufficiently informed the jury that the differing mens rea elements were mutually exclusive. Because the instructions adequately distinguished the differing mental states, we find the trial court did not err in failing to instruct the jury on the State's burden to disprove Appellant's heat of passion defense as the instructions sufficiently did so as a whole. *See McCormick*, 1993 OK CR 6, ¶¶ 26 & 28, 845 P.2d at 901.

■ ¶ 49 We also find the instructions administered allowed the jury to consider Appellant's heat of passion defense in conjunction with its consideration of the murder elements. Although the instructions administered advised the jury procedurally to consider murder first and only if it had a reasonable doubt as to the proof of murder then to consider manslaughter, other instructions dictated that the jury consider Appellant's heat of passion evidence in determining if Appellant possessed a deliberate intent when he stabbed Pogue. Specifically, in its consideration of the murder elements, the jury was instructed to consider the external circumstances surrounding the commission of the homicidal act to determine if Appellant possessed a deliberate intent to take a human life. Such external circumstances included Appellant's "words, conduct, demeanor, motive, and all other circumstances connected" with the fatal stabbing of Pogue. Therefore, based on the instructions administered, we find Appellant was not deprived of having the jury consider his heat of passion defense in tandem with the murder charge. As such, we find the instructions administered in this case were constitutionally adequate to ensure that the appropriate burdens of proof were allocated to the parties and that the jury was free to consider Appellant's defense. Therefore, we find no plain error occurred.[17]

■ ¶ 50 In his third proposition of error, Appellant claims the trial court's instruction defining adequate provocation was erroneous because it focused the inquiry on the improper conduct of the victim rather than the

defendant's state of mind. He maintains that the instruction, when coupled with the prosecutor's improper argument, misled the jury into believing that to find adequate provocation to reduce the crime to manslaughter, the jury had to find the victims acted improperly and were at fault. Appellant also claims the instruction was deficient because it failed to advise the jury that adequate provocation may be supplied by mutual combat. He acknowledges that the trial court's instruction [18] mirrored the uniform one [19] and that counsel failed to object.

¶ 51 In the current uniform instruction which was administered to Appellant's jury, "adequate provocation" is defined as

> any *improper conduct of the deceased* toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant. Generally, actions which are calculated to provoke an emotional response and ordinarily cause serious violence are recognized as adequate provocation. Actions that do not ordinarily provoke serious violence do not constitute adequate provocation. In determining whether the deceased's conduct was adequate provocation, the conduct is judged as a person of reasonable intelligence and disposition would respond to it. Mere words alone, or threats, menaces, or gestures alone, however offensive or insulting, do not constitute adequate provocation. However, words, threats, menaces, or gestures, when considered in connection with provoking conduct of the deceased, may constitute adequate provocation. Personal violence or aggression by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant may be adequate provocation.

(emphasis added).

■ ¶ 52 Appellant never challenged this definition, thereby waiving any claim unless plain error is found. *Hill v. State*, 1995 OK

---

17. That is not to say more specific instructions, if requested, are not desirable.

18. O.R. 82.

19. OUJI–CR2d 4–98.

CR 28, ¶ 21, 898 P.2d 155, 163. He now objects to the use of the term "improper conduct" arguing a jury could construe it to mean heat of passion can be claimed only when the victim engaged in an act of adequate provocation. He claims that it is widely accepted that heat of passion may be claimed when a reasonable person in the defendant's situation would have concluded that the victim engaged in an act of adequate provocation whether the victim actually did so or not. He concedes the "typical heat of passion case will indeed involve improper conduct by the deceased." *Appellant's Brief* at 29.

¶ 53 Even if we accepted Appellant's argument that the deceased need not actually engage in an act of adequate provocation as long as a reasonable person in the defendant's shoes would have believed the victim had done so, which we need not determine in this case, we fail to see how Appellant could have been injured by this instruction. Here, if the jury believed the theory of the defense, *i.e.*, that Pogue and Lewis threw the first punches after Jesse and Jimmy merely walked toward them in a non-threatening manner, and that Appellant merely acted to save the life of his brother in the ensuing brawl that followed, the jury could potentially have found that the conduct of the victims was "improper," within the context of the adequate provocation instruction. Appellant's problem was not the instruction, but the fact that the jury did not accept the defense's version of events. And a jury conclusion that Appellant was not adequately provoked was well supported by the evidence. Therefore, we find the instruction's wording was appropriate and properly channeled the jury's decision making process in this case.

¶ 54 We also find the prosecutor did not engage in improper argument. To refute Appellant's heat of passion defense, the prosecutor argued the evidence did not support a finding of adequate provocation and that Pogue and Lewis were merely trying to defend themselves when they threw the first punches. The prosecutor argued Appellant and the others went looking for the men who were supposedly after Shankles ready to fight. When they believed they had found them, Appellant forced the Blazer to stop where his brothers jumped out of the Neon in a threatening manner rushing the victims. The victims threw punches at the Blacks to defend themselves from the Blacks' advance. Because the prosecutor simply argued reasonable inferences from the evidence, we find no plain error occurred.

¶ 55 Lastly, Appellant claims the instruction was defective because it failed to specifically advise that mutual combat may constitute adequate provocation. As stated above the jury was presented with two versions of how the altercation began. The instruction administered correctly required the jury to determine if Appellant was adequately provoked based on the facts presented. As such, we find no plain error.

¶ 56 In his fourth proposition, Appellant claims the trial court's self-defense instructions were fatally flawed because: 1) the instructions conflated the distinct defenses of justifiable homicide (21 O.S.1991, § 733(2)) and self defense/defense of another (21 O.S.1991, § 643(3)); 2) the instructions failed to inform the jury of the law relating to defense of another; and 3) the instructions stated as a matter of law "defense of a brother is not available as justification for homicide or assault and battery." At trial, Appellant did not object to the self-defense instructions except to the statement that defense of a brother is not available as justification for homicide or assault and battery. Defense counsel stated she understood that to be the law, but was concerned that this non-standard language would mislead the jury into thinking that evidence of Appellant's motives was not relevant. Because Appellant failed to object at trial to the self-defense instructions on the grounds he now asserts, he has waived all but plain error. *See Romano v. State*, 1995 OK CR 74, ¶ 80, 909 P.2d 92, 109, *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

¶ 57 Appellant asserts the trial court correctly instructed the jury on justifiable homicide for murder, but argues it failed to properly instruct the jury on self-defense for assault and battery. He claims the trial

court should have administered the self-defense instruction found in OUJI–CR2d 8–48 for his assault and battery with a deadly weapon charge. This self-defense instruction justifies a person's use of non-deadly force if the jury finds the defendant reasonably believed that he was in imminent danger of bodily harm.[20] He also claims the trial court should have instructed the jury on defense of another pursuant to 21 O.S.1991, § 643(3) as a defense to the assault and battery with a deadly weapon charge, as § 643 does not limit the class of persons one may defend with non-deadly force. By instructing the jury that defense of a brother was not available as justification for assault and battery, Appellant maintains the trial court's instructions deprived him of a valid defense to his assault and battery with intent to kill charge as well as misled the jury to believe that evidence regarding Appellant's defense of his brothers was irrelevant as a matter of law to his heat of passion manslaughter defense.

¶ 58 As the State points out, Appellant was not entitled to an instruction on the justifiable use of non-deadly force as a defense to assault and battery with intent to kill because Appellant used deadly force when he stabbed Lewis and Pogue. "Deadly force" is defined as "force intended or likely to cause death or great bodily injury." OUJI–CR2d 8–12. Appellant stabbed Lewis thirteen times including wounds to the head and chest. Simply because Lewis did not die from his injuries does not render Appellant's use of force non-deadly. Because Appellant used deadly force against Lewis, he was not entitled to an instruction on the justifiable use of non-deadly force, and the trial court's instructions adequately stated the applicable law, including that Appellant was not entitled to the justifiable use of deadly force in defense of a brother. 21 O.S.1991, § 733(2). In addition, Appellant cannot show plain error in the self-defense instructions as he did not rely on it as a defense; rather he relied on a heat of passion defense. *See* n. 14, *supra.* Accordingly, no relief is required.

¶ 59 In his fifth proposition of error, Appellant reurges his claim in Proposition I asking this Court to reconsider its previous decisions holding that heat of passion manslaughter requires the killing to be both in a heat of passion and without a design to effect death. As such, he argues the instructions on heat of passion and adequate provocation are superfluous and misleading. He maintains the instructions administered could have led the jury to convict Appellant of first degree murder even if it found Appellant was rendered incapable of forming an intent to kill by his heat of passion but that there was inadequate provocation. Because the jury was adequately instructed on the elements of both crimes, we find this proposition is without merit. *See* Propositions I, II and III, *supra.*

¶ 60 In his tenth proposition of error, Appellant claims his assault and battery with a deadly weapon conviction must be reversed because the State failed to prove he intended to kill Lewis. Appellant again maintains the State was bound by his exculpatory statements that he never intended to kill anyone and that the State's evidence failed to rebut his admissions.

¶ 61 The direct and circumstantial evidence presented at trial, when viewed in the light most favorable to the State, was sufficient for a rational trier of fact to conclude Appellant intended to kill Lewis when he stabbed him. As stated above, the evidence showed the Black brothers, including Appellant, Shankles and Seales went looking for Justin Hightower where a fight of some kind was likely and anticipated. Appellant went armed with his knife. When the defendants encountered the victims, Appellant followed Pogue's Blazer and then forced it to stop. Without pause, Jimmy and Jesse Black jumped out of the car and rushed Lewis and Pogue in a threatening manner demonstrating a group intent to fight the Blazer occupants. Appellant immediately followed Jesse and joined in a fight with Lewis where Appellant quickly pulled out his knife. Despite Appellant's claim he feared for their (Jesse and his own) safety, it

---

**20.** The instruction administered by the trial court advised that a person's use of deadly force was justified if the jury found the defendant believed he was in imminent danger of death or great bodily harm.

is difficult to believe Appellant did not intend to kill Lewis when he stabbed him some thirteen times with wounds to the head and chest in what was then a three on one fight. As previously noted, because the lighting was good enough for Lewis to identify the defendants, the jury could infer Appellant would have been able to see Jesse was not being seriously injured thereby refuting Appellant's claim. Further, the physical injuries sustained by the Blacks belie Appellant's claim that he acted out of a fear for the safety of his brothers and himself. The physical injuries sustained by the victims corroborate that they were not in control of the fight. The jury could also infer a consciousness of guilt on behalf of Appellant because he disposed of the knife and fled the morning after the fight. Because a rational jury could find Appellant intended to kill Lewis when he stabbed him thirteen times and disbelieve Appellant's exculpatory statements, we find this proposition is without merit.

¶ 62 In his eleventh proposition of error, Appellant claims the trial court erred in instructing the jury that a knife is a deadly weapon.[21] Appellant argues a pocket knife is not a deadly weapon *per se*[22] and that the trial court's instruction invaded the province of the jury. Because Appellant failed to object to the instruction, we will review for plain error. *Cannon*, 1998 OK CR 28, at ¶ 34, 961 P.2d at 849.

¶ 63 A review of the record shows no plain error occurred. As the State points out, Appellant admitted he used his pocket knife to stab both victims numerous times. He further admitted that such stabbing inflicted great bodily injury to Lewis and resulted in Pogue's death, making his knife a deadly weapon. Because the issue at trial was whether Appellant intended to kill Lewis and not whether the knife was capable of causing death or great bodily injury,[23] we find no plain error.

¶ 64 In his nineteenth proposition of error, Appellant alleges he was denied the reasonably effective assistance of trial counsel in violation of the Sixth Amendment. Appellant argues his two trial attorneys were deficient because they failed to request accurate and complete heat of passion manslaughter instructions as argued in Propositions II and III, *supra*, and failed to marshal the evidence in closing argument. Appellant also claims his attorneys failed to adequately prepare, investigate and use available evidence: 1) to impeach Lewis' testimony; 2) to rebut the State's evidence regarding the poor health of Pogue and the conditions of the crime scene; and 3) to corroborate the defense theory of mutual combat.

¶ 65 "To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance." *Humphreys v. State*, 1997 OK CR 59, ¶ 40, 947 P.2d 565, 577–78, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). *See also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "To establish prejudice, Appellant must show a reasonable probability that, but for trial counsel's errors, the result of his [trial] would have been different." *Humphreys*, 1997 OK CR 59, at ¶ 40, 947 P.2d at 578. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

---

21. The trial court defined "deadly weapon" as "any instrument designed or constructed to cause death or great bodily injury. A knife is a deadly weapon." (O.R. at 88)

22. Knives that are *per se* deadly weapons include: dagger, bowie knife, dirk knife, switch blade knife, spring-type knife or a knife having a blade which opens automatically. OUJI–CR2d 4–28.

23. It should be noted the elements instruction concerning assault and battery with a deadly weapon administered by the trial court increased the State's burden with respect to the disputed intent issue by requiring the State to prove Appellant intended to kill Lewis rather than that Appellant intended to do Lewis great bodily harm. *See* O.R. 86; OUJI–CR2d 4–6. Additionally, the trial court instructed the jury on the lesser included offense of assault and battery with a dangerous weapon and defined dangerous weapon. (O.R.89–90)

Failure to prove either of the required elements is fatal to an appellant's entire claim. *Douglas*, 1997 OK CR 79, at ¶ 108, 951 P.2d at 679.

¶ 66 First, Appellant attacks counsel's failure to request instructions advising the jury that Appellant's sole defense was that he killed Pogue in a heat of passion brought on by mutual combat, that the heat of passion manslaughter defense should be considered simultaneously with the murder charge, that the State bore the burden to disprove heat of passion manslaughter beyond a reasonable doubt and that adequate provocation may be supplied by mutual combat. As discussed in Propositions II and III, *supra*, we find the jury was adequately instructed on heat of passion. Therefore, we find that defense counsel were not ineffective in failing to request modified instructions.

¶ 67 Second, Appellant complains his lawyers failed to marshal the evidence during closing argument. He claims their statements that the victims did nothing wrong essentially told the jury there was no adequate provocation, given that the instruction defining adequate provocation directed the jury to review improper conduct of the deceased toward the defendant. A review of the closing argument shows Appellant's lawyers marshaled the evidence and vehemently argued Appellant never intended to kill anyone and that the evidence supported heat of passion manslaughter. Although counsel did not characterize the victims' conduct as improper so as not to alienate the jury, she argued the conduct had to be taken into consideration as to how Appellant perceived it and reacted to it. She mindfully characterized the inconsistencies between Lewis' version of events and that of the defendants as nagging questions the jury must consider. This was a sound strategic decision that will not be second-guessed on appeal. As such, we find no error.

¶ 68 In conjunction with this claim Appellant filed an application for an evidentiary hearing alleging counsel failed to investigate and use available evidence. Appellant argues counsel was deficient by failing to investigate and present evidence that showed Pogue could have avoided the altercation by driving around the Neon contrary to Lewis' testimony, and that Pogue's health was not as poor as portrayed by his family. Pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2000), Appellant has included in his application for an evidentiary hearing records to support his claim. Appellant includes, among other things, affidavits and reports from doctors who examined Pogue in 1996 in conjunction with a worker's compensation claim detailing their findings regarding Pogue's health, articles which showed Pogue was participating in and placing in roping events in 1996, and photographs of the scene to show Pogue's Blazer could have negotiated around the Neon. (Exh. A, B, C, H, I, J, K, M, N, O, P and R)

¶ 69 The record before this Court shows counsel mounted a well-reasoned defense to the first degree murder charge arguing Appellant stabbed the victims because he feared for the safety of his brothers during a fight and that Appellant never intended to kill anyone. The medical records supplied by appellate counsel are from exams one and half years before the incident. These records show that Pogue had asthma and did little because he was clinically depressed. Instead of introducing this type of evidence to show Pogue was not feeble and in poor health such that he would not consider initiating a fight, counsel chose to focus on the fact that 54 year old Pogue got out of his vehicle, threw the first punch and was able to hold down and contain Jimmy Black, a 6'2", 230 lbs. 25-year-old, during the fight. The record also shows counsel did question witnesses about the possibility of the Blazer being able to go around the Neon.[24] Because

24. As discussed above, Appellant filed an "Application for Evidentiary Hearing on Jury Issues" pursuant to Rule 2.1(A)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1999) and 12 O.S.1991, § 2606(B). Contained in his application is an affidavit from one of the jurors who served in his case in which the juror states that an unnamed juror, who was somehow familiar with the crime scene area, told the other jurors that Pogue could not have gone around the Neon because of a ditch on the side of the road. Based on this affidavit, Appellant

Pogue was a well-known, valued member of the community, counsel was careful not to demonize Pogue by arguing he was the aggressor who purposefully stopped his Blazer to teach these people a lesson for honking at him rather than going on by or that Pogue somehow had a duty to go around them. Given the record before this Court, we find this claim is without merit and that an evidentiary hearing is not warranted because the application and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was deficient for failing to utilize the complained-of evidence.

¶ 70 In his twentieth proposition of error, Appellant claims he was denied his right to present a defense when the trial court excluded his co-defendants' confessions under 12 O.S.1991, § 2804(B)(3). On the first day of trial, the trial court heard the State's motion *in limine* to exclude the co-defendants' statements as hearsay. Defense counsel argued if the trial court excluded the statements, she would be forced to change her entire trial strategy and would be ineffective. The trial court noted that defense counsel had been aware of this problem two weeks prior to trial. At the conclusion of argument, the trial court found that it had not heard sufficient evidence to determine if the statements were exculpatory or that there existed sufficient corroborating circumstances to indicate trustworthiness as required by § 2804(B)(3). As such, the trial court reserved ruling on the admissibility of these statements until more evidence was presented.

¶ 71 Ultimately, the trial court admitted Robbie Seale's statement, but found the statements of Jimmy and Jesse Black were not sufficiently corroborated for admission. Appellant maintains that even though Jimmy testified at trial he was prejudiced by the exclusion of Jimmy and Jesse's statements because: 1) it forced counsel to change her

strategy; 2) the prosecutor was able to suggest that Jimmy and Appellant colluded on the story Jimmy told the jury; and 3) Appellant was precluded from presenting a full picture of what happened that night and to provide the jury with corroboration of his statements that he did not intend to kill anyone.

¶ 72 Assuming, arguendo, the trial court erred in excluding these statements, Appellant's right to present his defense was not impeded. As stated above, the record shows defense counsel knew at least two weeks before trial there could be problems with admitting the co-defendants' statements. Despite potential problems, the defense resolutely pursued its heat of passion manslaughter defense relying on the same facts. Moreover, co-defendant Jimmy Black's voluntary testimony, given against the advice of counsel, was almost identical to his statement. Though he added it looked like the victims were moving around inside the Blazer reaching for something, which allowed the prosecutor to remark that the testimony sounded familiar and to ask Jimmy if he and Appellant had talked about his story prior to trial or his arrest, Jimmy denied any collusion. Because Jimmy testified voluntarily and failed to mention anything about the victims reaching for anything in his statement, the State was free to ask questions to test his veracity and it is difficult to see how Appellant was prejudiced by the exclusion of his statement since he testified in substantially the same manner at trial. Further, the exclusion of Jesse's statement did not prevent Appellant from presenting his defense. Jesse's statement only corroborated the sequence of events and that he and Jimmy had no intent to kill. Given the evidence presented, Appellant cannot show he was prejudiced by the exclusion of Jimmy's and Jesse's statements. Accordingly, we find this proposition is without merit.

---

maintains the jury was exposed to and relied on extraneous information in reaching its verdict. He requests an evidentiary hearing to investigate his claim. Both Lewis and Charles Pogue testified Pogue could not go around the Neon because of the bar ditches. Nowhere in the affida-

vit does the juror state that she or the other jurors relied on this unnamed juror's opinion rather than on the evidence. Given that this affidavit does not support a finding that the jury relied on extraneous information, the request for an evidentiary hearing is denied.

## SECOND STAGE ISSUES

¶ 73 In his sixth proposition of error, Appellant claims it is unconstitutional to impose the death penalty upon a defendant who commits a homicide while in a heat of passion. We agree and believe that is why heat of passion manslaughter is not punishable by death. However, we disagree with Appellant that the facts of this case proved heat of passion manslaughter. As discussed in Proposition I, *supra*, the evidence was sufficient for a rational jury to conclude Appellant killed Pogue with malice aforethought making his act first degree murder and constitutionally punishable by death.

¶ 74 In his thirteenth proposition of error, Appellant claims the evidence was insufficient to sustain the jury's finding that he knowingly created a great risk of death to more than one person and that this aggravating circumstance is vague and overbroad as applied to him. He maintains the evidence was insufficient because Lewis was never at a great risk of death and Appellant never intended to kill anyone.

¶ 75 "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." *Washington*, 1999 OK CR 22, at ¶ 44, 989 P.2d at 974. We have held the great risk of death aggravating circumstance is proved by acts of a defendant which create a great risk of death to another in close proximity, in terms of time, location, and intent to the killing. *Thornburg v. State*, 1999 OK CR 32, ¶ 42, 985 P.2d 1234, 1248, *cert. denied*, 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). We have also consistently rejected attacks that this aggravator is vague and overbroad and continue to so find in this case. *Id.*, 1999 OK CR 32, at ¶ 44, 985 P.2d at 1248.

¶ 76 In the instant case, Appellant disregards the plain language of the statute and argues this aggravating circumstance should apply only if the defendant's conduct caused a person to be near death rather than create the possibility thereof. Actual life threatening injury, however, is not the test. *See Smith v. State*, 1986 OK CR 158, ¶ 31, 727 P.2d 1366, 1373, *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987) (holding "evidence is sufficient to support the aggravating circumstance of knowingly creating a great risk of death to more than one person where a defendant during the continuing course of conduct in which a murder is committed, threatens the life of another and has the apparent ability and means of taking that person's life."). As discussed in Proposition X, *supra*, Appellant stabbed Lewis thirteen times including wounds to the back of the head and one to the chest. The direct and circumstantial evidence presented at trial was sufficient to prove Appellant intended to kill Lewis when he did so. This same evidence is also sufficient to prove Appellant knowingly created a great risk of death to more than one person when he stabbed Lewis and Pogue numerous times in vital areas. As such, this claim is denied.

¶ 77 In his fourteenth proposition of error, Appellant asks this Court to reconsider its prior decisions upholding the constitutionality of the aggravating circumstance that the defendant constitutes a continuing threat to society. Appellant maintains this aggravating circumstance is unconstitutionally vague and fails to perform the narrowing function that is constitutionally required. This Court has consistently held, and continues to find, that this circumstance is constitutional and that the uniform jury instructions properly define and channel the jury's decision making process. *See Welch v. State*, 2000 OK CR 8, ¶ 48, 2 P.3d 356, 374, *cert. denied*, —— U.S. ——, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000); *Malone v. State*, 1994 OK CR 43, ¶ 28, 876 P.2d 707, 716. Because we reaffirm our prior holdings, we find this proposition must be denied and no relief is warranted.

¶ 78 In his fifteenth proposition of error, Appellant argues the aggravating circumstance that the murder was especially heinous, atrocious or cruel is unconstitutionally vague and overbroad and that the trial evidence was insufficient to support the jury's finding of this circumstance. We again uphold the constitutional validity of this aggravating circumstance and decline

Appellant's invitation to reconsider our position. *Cannon v. State,* 1998 OK CR 28, at ¶ 72, 961 P.2d at 855; *Le v. State,* 1997 OK CR 55, ¶ 43, 947 P.2d 535, 552, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

¶ 79 We further find the evidence, when viewed in the light most favorable to the State, was sufficient to find beyond a reasonable doubt the murder of Pogue was especially heinous, atrocious or cruel.[25] This Court upholds a jury's finding of this aggravating circumstance when it is supported by proof of conscious serious physical abuse or torture prior to death; evidence a victim was conscious and aware of the attack supports a finding of torture and serious physical abuse. *See Le,* 1997 OK CR 55 at ¶ 35, 947 P.2d at 550. The evidence showed Appellant forced Pogue to stop his vehicle after which Appellant's brothers attacked Pogue and Lewis. During the fight, Appellant stabbed both men numerous times. The evidence further showed Pogue was conscious and alive suffering pain during and after the attack. This evidence is sufficient to support this aggravating circumstance. Accordingly, this claim is denied.

¶ 80 In his seventeenth proposition of error, Appellant claims the prosecutors abdicated their role as ministers of justice for the people of Oklahoma and instead acted as special prosecutors representing the interests of the victims' family. Appellant asserts that the prosecutors filed first degree murder charges at the insistence of the Pogue family, and in so doing, arbitrarily charged an offense punishable by death that was not otherwise supported by the facts.

¶ 81 Both Appellant and the State cite *Carpenter v. State,* 1996 OK CR 56, 929 P.2d 988, which is dispositive. In *Carpenter,* the defendant, who maintained he had no intent to kill the victim, argued the prosecutor acted as a special prosecutor in seeking the death penalty by allowing his decision to be controlled by the wishes of the victim's family. It was undisputed the prosecutor consulted with the family during plea negotiations. *Carpenter,* 1996 OK CR 56, ¶ 22, 929 P.2d at 995. There, the family advised the prosecutor that a plea arrangement of life was unacceptable. This Court held that the defendant failed to carry his burden of proof to show that the prosecutor yielded control of the case to the victim's family. *Carpenter,* 1996 OK CR 56, at ¶ 24, 929 P.2d at 995. The *Carpenter* court noted the State is under no obligation to plea bargain and the decision whether to prosecute and what to charge is within the discretion of the prosecutor. *Carpenter,* 1996 OK CR 56, at ¶ 23, 929 P.2d at 995. The fact that a district attorney may speak with the victim's family concerning their feelings is hardly sufficient proof that he allowed them to completely control all decisions regarding plea negotiations. *Id.* Furthermore, consulting the victim's family and keeping them informed of the case's progress is not abdication of the prosecutorial role. *Id.* In denying Carpenter's claim, this Court pointed out that even if Carpenter could have quantified the input of the victim's family, he had alleged nothing that showed the prosecutor would have acted differently in their absence. *Carpenter,* 1996 OK CR 56, at ¶ 24, 929 P.2d at 995.

¶ 82 As in *Carpenter,* Appellant here offers isolated statements in which the prosecutors remark that they had spoken with the family of Pogue and Lewis to understand their view on venue and plea negotiations.[26] There is nothing in the quoted comments indicating that the district attorney yielded control of the prosecution to the victims' family.[27] Furthermore, the charges filed in Appellant's

---

**25.** Appellant asks this Court to abandon its traditional standard of review used in determining the sufficiency of the evidence of an aggravating circumstance in favor of *de novo* review. We are unpersuaded a different standard is needed and decline to do so.

**26.** Appellant cites Lewis' participation in the plea negotiations of Robbie Seale as evidence the victims' family directed the actions of the prose-

cutor. These negotiations occurred the day after Appellant's trial and no such direct participation in Appellant's trial appears in the record.

**27.** The District Attorney stated at sentencing "[w]e consulted the victim's family on almost every aspect of the case. Never once did we surrender our discretion to them, but we did inform them." (Sent.9)

case were supported by the evidence produced by the State, and Appellant has alleged nothing to show that the prosecutors would have filed different charges absent the input of the family members. Because Appellant has failed to show that the prosecutors yielded control of the case to the victims' family, this proposition is denied.

¶ 83 In his eighteenth proposition of error, Appellant complains the trial court's failure to record all bench conferences, its rulings, the exercising of peremptory challenges and the selection of jury alternates undermines his right to appeal and the ability of this Court to conduct its mandatory review. Specifically, Appellant cites twelve places where bench conferences were held out of the hearing of the jury, which were not transcribed by the court reporter. He cites *Van White v. State,* 1988 OK CR 47, 752 P.2d 814 and *Kelly v. State,* 1984 OK CR 99, 692 P.2d 563 (Brett, J., specially concurring) in support of his allegation that the failure to properly transcribe the bench conferences requires the vacation of his sentence and reversal of his conviction.

¶ 84 In *Van White,* this Court reversed the appellant's conviction because the *voir dire* proceedings had not been transcribed. We held that in order to "effectuate this Court's mandatory review obligation under 21 O.S.Supp.1985, § 701.13(C)(1), a complete stenographic record shall be taken in all capital cases." *Van White,* 1988 OK CR 47, at ¶ 17, 752 P.2d at 821. Because there was no record of the jury selection process, this Court was unable to determine "whether or not the jury was improperly prejudiced to impose a sentence of death during *voir dire.*" *Id.*

¶ 85 In the present case, the majority of the non-recorded portions identified by Appellant involve conferences between counsel and the trial court which were held outside the hearing of the jury. Although Appellant claims that these conferences were critical, he does not allege any error arising from a ruling of the trial court made during one of the conferences. In fact, there are no allegations of evidentiary error alleged at all. A review of the record shows that many of the non-recorded conferences involve ministerial

functions and that the context of the non-recorded conferences is apparent when the proceedings are resumed. This record also shows defense counsel never hesitated to make a record after receiving an adverse ruling.

¶ 86 As we stated in *Parker v. State,* 1994 OK CR 56, ¶ 26, 887 P.2d 290, 294:

Because the bench conferences were held outside the hearing of the jury, we are not inclined to include them in a blanket rule which would require automatic reversal as is the case with other portions of the trial such as jury selection. Lack of record of bench conferences does not hinder our ability to conduct the mandatory sentence review required under the Oklahoma Statutes. Conferences at the bench, while potentially effecting (sic) the actual evidence presented or the manner in which the evidence is presented, do not in and of themselves influence our determination of "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." Section 701.13(C)(1). Problems involving the rulings resulting from the conferences are easily appealed in their own right.

¶ 87 We also find the failure to transcribe the exercising of peremptory challenges and the selection of the juror alternates does not require relief. The attorneys exercised their peremptory challenges at the bench after which the trial court would excuse the challenged juror on the record. A full *Batson* hearing was held on the record when the State excused a minority juror and the defense objected. The record shows the alternates did not serve and therefore any error in that selection process is moot.

¶ 88 While this Court continues to believe that the better practice in a capital case is the transcription of the entire proceeding, including any and all bench conferences and proceedings had in chambers, we are unable to conclude that any error has occurred in the present case that requires relief from this Court. Our ability to perform our required review is not impeded and we fail to see how Appellant was prejudiced by the

**1076**

failure to record the portions of the record he cites. As such, relief is not required. *Parker,* 1994 OK CR 56 at ¶ 27, 887 P.2d at 294–95.

¶ 89 In his twenty-first proposition of error, Appellant claims the State failed to give adequate notice of second-stage witness O.S.B.I. Agent Jack Daly, who testified to the facts surrounding Appellant's prior violent felony conviction. Due to the inadequacy of the State's notice, Appellant maintains Daly's testimony was inadmissible to prove the prior violent felony aggravating circumstance or to bolster the State's continuing threat to society contention.

¶ 90 After the jury rendered its verdict in the guilt/innocence phase and just prior to the motion hearing preceding the sentencing phase, the State provided defense counsel with a file consisting of 75–100 pages detailing Agent Daly's investigation of Appellant's prior manslaughter crime and his interview with Appellant. Initially, defense counsel moved to quash the Bill of Particulars listing Agent Daly as a witness because the State had failed to provide adequate notice. Defense counsel relayed to the trial court how discovery of this evidence had been requested multiple times prior to trial, but she was told that the State was not sure Agent Daly would be called to the stand and that the file of his reports could not be found. Defense counsel also moved for a two to three day continuance so she could study the materials and determine with Appellant how to proceed in a *Brewer*[28] hearing. In support of her motion counsel argued that she had made every effort to obtain the information-she spoke with her client regarding the crime, contacted Agent Daly at the O.S.B.I.

and asked for the information, and called the brother of the victim from the prior conviction. She claimed that none of her attempts provided the detailed information contained in the file provided by the State and that the new information required review before she could decide whether or not to stipulate to the conviction.

¶ 91 The State argued the Bill of Particulars listed Agent Daly as a witness and specified that he would testify to the facts surrounding the prior conviction.[29] In addition, the State emphasized that defense counsel had access to her client as well as the preliminary hearing transcript in which Agent Daly testified to all the relevant information. In defense of its late production of the evidence, the State asserted that the O.S.B.I. was in possession of the files and that the information therein was not a part of the State's strategy because Appellant could choose to stipulate to the prior conviction and prevent the State from going behind the conviction.[30] The trial court granted defense counsel a continuance from 3:00 p.m. until 8:30 a.m. the next morning.

¶ 92 When the court reconvened the next morning, defense counsel was late to the proceedings and her co-counsel decided to stipulate to the prior conviction. The trial judge inquired from Appellant as to whether he understood the stipulation he was making and Appellant answered in the affirmative. When Appellant's lead counsel arrived she reasserted her motion to quash based on the late production of the evidence.[31] The trial court denied all of Appellant's motions. Defense counsel fervently argued that her review of the materials provided much new information that was not available in any of

---

28. Per *Brewer,* a defendant may stipulate to any prior felony convictions involving threat and violence and thus prevent the State from going behind the judgment and sentence to present the specific details of the crime as proof of the threat and violence. If the defendant stipulates, the State is only allowed to introduce the judgment and sentence from the prior conviction. *Brewer v. State,* 1982 OK CR 128, ¶ 42, 650 P.2d 54, 63, *cert. denied,* 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983).

29. The State's notice provided that Daly would "testify regarding the facts involving the death of

Cecil Martin at the hands of [Appellant] on the 13th day of December, 1983."

30. Prosecutor Burns advised the trial court that his office had only sent an agent the day before to retrieve the file from the O.S.B.I. He claimed the prosecution and the defense were working from the same facts as contained in prior court records. (Tr. 814)

31. Defense counsel stated she was late to court because she was reviewing the new material and was unprepared to proceed.

the sources to which she had had access, including the preliminary hearing transcript. She also moved for a one week continuance to investigate the new material.[32] Ultimately, defense counsel opted not to stipulate and Appellant did not sign off on the stipulations. Thereafter Daly was allowed to testify about his interview with Appellant concerning Appellant's prior manslaughter conviction, specifically the incriminating details Appellant gave in his statement to Daly. At the conclusion of direct examination, defense counsel announced she was unprepared to cross-examine due to the late discovery of Daly's investigative file. Because defense counsel objected to the admission of Agent Daly's testimony, this issue has been preserved for appeal.

¶ 93 The rules governing this claim were recently set forth again in *Miller v. State,* 1998 OK CR 59, ¶ 65, 977 P.2d 1099, 1112, *cert. denied,* 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999):

> Title 21 O.S.1991, § 701.10 provides that during the penalty phase of trial only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. This Court held in *Wilson v. State,* 1988 OK CR 111 n. 1, 756 P.2d 1240, 1245 n. 1 that § 701.10 does not require the State to give a detailed description of the evidence that will be offered in the second stage. Notice is sufficient if it allows the defendant the opportunity to present a defense or explanation for the alleged criminal conduct. *Johnson v. State,* 1982 OK CR 37, ¶ 36, 665 P.2d 815, 823. To this end the notice must contain a summary of the evidence intended to be used to support the alleged aggravating circumstance as well as a list of the witnesses the State might call. *Williamson v. State,* 1991 OK CR 63, ¶ 112, 812 P.2d 384, 408, *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2122, 128 L.Ed.2d 677 (1994); *Walker v. State,* 1986 OK CR 116, ¶ 48, 723 P.2d 273, 285, *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986).

¶ 94 The non-specific notice coupled with the late disclosure of Daly's investigative file was insufficient notice to allow the defense to know what to expect. Because the record shows the defense knew about the prior conviction and had access to the preliminary hearing transcript in that case, the crux of the problem is the late disclosure of Daly's investigative file. This Court must decide if the prosecution's late disclosure of Daly's investigative file prejudiced Appellant. *See Newsted v. State,* 1986 OK CR 82, ¶ 15, 720 P.2d 734, 739, *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The reasons offered for the late disclosure are unacceptable and are not condoned by this Court. Such last minute disclosure violates, at the very least, the spirit of the notice requirements and resembles condemned gamesmanship. *See Marquez v. State,* 1995 OK CR 17, ¶ 6, 890 P.2d 980, 983. However, Appellant has not provided this Court with the preliminary hearing transcript from his prior manslaughter case or Daly's investigative file in order for this Court to determine if Appellant was prejudiced by the late disclosure. Nor does Appellant identify how he would have defended differently. As the trial court granted counsel a continuance to review the material and Appellant has not shown how he would have changed his defense, we cannot find that Appellant was prejudiced by the late disclosure of the file and this claim must be denied.

¶ 95 In his twenty-second proposition of error, Appellant claims his conviction and sentence must be vacated because he was deprived of a fair trial by the prosecutors' misconduct. Appellant alleges that the prosecutor(s) attempted to inject passion and sympathy into the first stage proceedings, improperly impeached a defense witness, improperly aligned themselves with the victim, jury and public, improperly evoked sympathy for the victims, ridiculed the defense theory, impugned defense counsel's character and credibility, expressed personal opinions, disparaged Appellant's family, equated Appellant with Charles Manson, misstated the law,

---

**32.** Although the State claims defense counsel did not request an additional continuance, the record shows otherwise. (Tr. 830)

and misrepresented evidence. Appellant argues the death sentence he received is further evidence that the prosecutors' misconduct prejudiced the jury.

 ¶ 96 The remarks objected to by defense counsel were cured when the trial court admonished the jury to disregard the comments and recall the evidence. *See White v. State,* 1995 OK CR 15, ¶ 22, 900 P.2d 982, 992. The remaining remarks were not objected to and will be reviewed for plain error. *Romano,* 1995 OK CR 74, at ¶ 54, 909 P.2d at 115. This Court has consistently held that it will not grant relief unless the cumulative effect of all of the prosecutor's conduct was such as to deny the defendant a fair trial. *Spears v. State,* 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445, *cert. denied,* 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995). Furthermore, each side is permitted to present the evidence and the inferences thereof from its own point of view. *Washington,* 1999 OK CR 22, at ¶ 42, 989 P.2d at 974.

¶ 97 In the instant case a review of the record does not reveal conduct that so prejudiced Appellant as to deny him the right to a fair trial. The trial court sustained each of defense counsel's objections to improper comments by the prosecutor. The majority of the remaining comments were within the latitude allowed during closing arguments. *Id.* The prosecutor's comment invoking the name of Charles Manson and several personal digressions by Mr. Burns invoking victim sympathy were error. However, viewing the trial as a whole and the substantial evidence presented to prove statutory aggravators, these few comments did not rise to the level of reversible error. Although some of the prosecutors' comments were borderline, none of them, singularly or cumulatively, rose to the level of reversible error. Accordingly, this proposition is denied.

 ¶ 98 In his final proposition of error, Appellant contends that, even if no individual error merits reversal, the cumulative effect of the errors in his case necessitates either reversal of his conviction or a modification of his sentence. This Court has said that in the absence of individual error, there can be no accumulation of error. *Lewis v. State,* 1998 OK CR 24, ¶ 63, 970 P.2d

1158, 1176, *cert. denied,* 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999). "However, when there have been numerous irregularities during the course of the trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *Id.* We have thoroughly reviewed Appellant's claims and the record in this case and they reveal no error which, singly or in combination, would justify either modification or reversal. Any irregularities or errors were harmless beyond a reasonable doubt. Finding no error that warrants relief, the Judgment and Sentence of the trial court is **AFFIRMED.**

LUMPKIN, P.J., JOHNSON, V.P.J., LILE, J., concur.

CHAPEL, J., concurs in result.