2002 OK CR 16

Jeffrey David MATTHEWS, Appellant,

v.

STATE of Oklahoma, Appellee.

No. D–99–1139.

Court of Criminal Appeals of Oklahoma.

April 8, 2002.

As Corrected April 23, 2002.

Silas Lyman, II, Oklahoma Indigent Defense System, Tulsa, OK, Bob Perrine, Attorney at Law, Norman, OK, Attorneys for Appellant at trial.

Richard Sitzman, Assistant District Attorney, Ronald Boone, Assistant District Attorney, Norman, OK, Attorneys for the State at trial.

Bill Zuhdi, Zuhdi Law Offices, Oklahoma City, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Timothy J. Gifford, Seth Branham, Assistant Attorneys General, Oklahoma City, OK, Attorneys for Appellee on appeal.

*OPINION*

STRUBHAR, J.

¶1 Jeffrey David Matthews, Appellant, was re-tried by jury in the District Court of Cleveland County, Case No. CF–95–183, following this Court's opinion reversing his original Judgment and Sentence and remanding the matter for new trial. *Matthews v. State*, 1998 OK CR 3, 953 P.2d 336. He was again convicted of First Degree Murder (Count I), Assault and Battery With a Deadly Weapon (Count II), Conspiracy to Commit a Felony (Count III) and Unauthorized Use of a Motor Vehicle.[1] This time the jury recommended death for Count I after finding that Matthews created a great risk of death to more than one person and that the murder was committed while Matthews was serving a sentence of imprisonment. The jury also found Matthews guilty of each non-capital felony after former conviction of two felonies and recommended one hundred years imprisonment on Count II, fifty years imprisonment on Count III and twenty years imprisonment on Count IV. The Honorable Candace Blalock followed the jury's sentencing recommendation and ordered the sentences to be served consecutively. From this Judgment and Sentence, he appeals.[2]

**FACTS**

¶2 The facts relevant to Matthews' convictions are thoroughly discussed in *Matthews*, 1998 OK CR 3, at ¶¶ 2–5, 953 P.2d at 339–40. We will not restate them here, except as may be necessary in our review of Matthews' twenty-three propositions of error relating to his retrial.

**JUROR MISCONDUCT/JURY SELECTION ISSUES**

¶3 In his first proposition of error, Matthews claims he was denied due process

---

1. Matthews was originally charged with first degree murder, assault and battery with a deadly weapon and conspiracy in McClain County Case No. CF–94–18. He was also charged in a separate case, Case No. CF–94–19, with unauthorized use of a motor vehicle. Although these crimes occurred in McClain County, a change of venue was granted, the cases were consolidated and jury trial was held in Cleveland County. Matthews was convicted of all counts and was sentenced originally to death for the murder and forty-five years imprisonment on each non-capital felony.

2. Matthews' Petition in Error was filed in this Court on November 1, 1999. His brief was filed June 12, 2001, and the State's brief was filed October 10, 2001. A reply brief was filed on December 31, 2001. The case was submitted to the Court on October 17, 2001. Oral argument was held February 5, 2002.

and a fair trial because jurors in his case were exposed to and engaged in unauthorized communications regarding the merits of the case during first stage deliberations and again between first stage verdict and the second stage. Matthews filed a motion for new trial based on this alleged juror misconduct and the trial court held hearings at which all twelve jurors were examined as well as other relevant witnesses.[3] Following the hearings, the trial court found no juror misconduct and denied the motion. Because this juror misconduct issue was litigated and involves the factual issues of whether there were improper communications that resulted in the jury considering extraneous information in rendering its verdict, we defer to the trial court's ruling unless it is clearly erroneous. *See Young v. State*, 2000 OK CR 17, ¶ 109, 12 P.3d 20, 48, *cert. denied*, 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001).

¶ 4 This claim stems from a communication that occurred between Juror No. 2[4] and alternate juror James DeHaven following the first stage verdict but before the beginning of the second stage. The record shows DeHaven, who was released prior to first stage deliberations, asked Juror No. 2 to call him and advise him of the verdict once it had been reached. The jury began its first stage deliberations around 4:30 p.m. on Friday, April 9, 1999, and reached a verdict early Saturday morning around 2:00 a.m. Thereafter the jury was released until Monday, April 12th with the admonition not to discuss the case with anyone. Despite the admonition, Juror No. 2 spoke with DeHaven on the telephone sometime Saturday the 10th either in the afternoon or evening concerning the verdict. Juror No. 2 and DeHaven differed on how long the conversation lasted and on the content of the conversation. However,

the evidence at its worst shows the conversation lasted fifteen minutes and that Juror No. 2 discussed with DeHaven the difficulty of making the decision, the numerical stance of the jury during deliberations, and general information about the deliberative process. In response, DeHaven told Juror No. 2 that he thought the jury had done the right thing, which Juror No. 2 understood as words of comfort following a difficult decision. DeHaven also informed Juror No. 2 that he had read the newspaper and indicated the articles supported the jury's verdict. He told her she would feel more sure about her decision once she was released and read the articles herself. DeHaven did not impart any information from the articles to Juror No. 2, and according to Juror No. 2, nothing he said affected her second stage verdict.

¶ 5 Juror No. 7 and Juror No. 8 testified they heard Juror No. 2 say she had spoken to DeHaven to report the guilty verdict. Both remembered Juror No. 2 stating that DeHaven had read the newspaper, but neither remembered Juror No. 2 stating anything about the newspaper supporting their verdict. Juror No. 7 and Juror No. 8 also testified that Juror No. 2's brief and lone statement about her contact with DeHaven had no affect on their second stage verdict. Based on this evidence, the trial court found a violation of its admonition but that no juror misconduct took place.[5]

¶ 6 Matthews maintains the trial court erred in its ruling, arguing he met his burden to show actual prejudice from the alleged juror misconduct since he established that Juror No. 2 violated the court's admonition and her oath by conversing with another person concerning the trial. 12 O.S.1991, §§ 576 & 581.[6] Alternatively, because he

---

3. We applaud Judge Blalock's prompt and thorough investigation of these claims so we have a complete record to review.

4. The jurors were referred to by number in the post-trial hearings in an effort to protect their privacy.

5. In making its ruling, the trial court noted for the record that alternate juror DeHaven was described as a "husky, virulent" young widower and Juror No. 2 was a "striking, beautiful divor-

cee." The judge was not surprised that DeHaven chose Juror No. 2 to call him and implied that these two had contact in part to perhaps launch some sort of a personal relationship.

6. Section 576 provides:

The jury shall be sworn to well and truly try the matters submitted to them in the case in hearing, and a true verdict give, according to the law and the evidence.

Section 581 provides:

showed a participating juror engaged in an unauthorized conversation about the case between the two phases of a capital trial, Matthews argues prejudice should be presumed as the case had been submitted and that the presumption cannot be rebutted by this record.

¶ 7 We have held that "[w]hen the alleged misconduct occurs subsequent to the submission of the case to the jury, the misconduct is presumed to have prejudiced the defendant and it is incumbent upon the State to show that he was not prejudiced." *Wacoche v. State,* 1982 OK CR 55, ¶ 14, 644 P.2d 568, 572. "However, where it appears that a juror converses with third parties during the trial and prior to deliberations, there must be a showing by the defendant that he was prejudiced." *Id.* Here, the contact occurred after the guilty verdict was reached and first stage deliberations ended, but before the beginning of the second stage. Based on *Wacoche* and the timing of the conversation, Matthews was required to show that he was prejudiced by the contact. Because first stage deliberations had ended and a verdict had been reached, we find, like the trial court, that the contact in no way affected the first stage verdict.

■■■ ¶ 8 We must now determine if this contact affected second stage. Second stage is a separate proceeding solely to determine punishment and it is not error to allow the jury to separate after its verdict in the first stage of a bifurcated proceeding prior to the submission of any evidence in the second stage. *See Frederick v. State,* 1995 OK CR 44, ¶ 30, 902 P.2d 1092, 1099; *McCracken v. State,* 1994 OK CR 68, ¶ 25, 887 P.2d 323, 330, *cert. denied,* 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); 21 O.S.Supp.1992, § 701.10(A). As noted above, the discussion between Juror No. 2 and DeHaven occurred between the first and second stage of trial and focused on the guilty verdict that had been reached. Though DeHaven told Juror No. 2 that he had read the newspaper and that it supported the jury's guilty verdict,

there is no evidence Juror No. 2, or any other juror, knew of the content of any newspaper articles and more specifically that Matthews had been previously sentenced to death for Short's murder. According to the testimony, Juror No. 2 was not privy to any information that DeHaven gleaned from the newspaper that could have influenced her sentencing decision during second stage deliberations. Moreover, there is no evidence Juror No. 2 and DeHaven ever discussed the evidence in the case or how she should vote in the pending second stage proceeding. When Juror No. 2 appeared for the second stage, she heard the relevant evidence and received the appropriate instructions on sentencing without any outside influence. Just because DeHaven told her he believed she had done the right thing in finding Matthews guilty and that the newspaper supported **that** decision, we do not see how that information would make her more willing to vote for a death sentence or somehow conclude that death was the appropriate punishment without more, especially in light of our weighing scheme. Based on the testimony presented, we find the trial court correctly denied Matthews' motion because he failed to prove he was actually prejudiced from this inappropriate conversation.

■■■ ¶ 9 Matthews also cites attorney Kenneth Adair's testimony to support his claim of juror misconduct. Adair testified that he saw DeHaven on Saturday, the 10th, and that DeHaven told him three female jurors called him when the jury was deadlocked in favor of acquittal. DeHaven claimed these jurors, who were in favor of guilt, asked him how to change the other's votes and DeHaven directed the jurors to certain evidence that he believed made Matthews' guilt clear. These allegations were explored at the post-trial hearings and no credible evidence was presented to show such communications occurred. All jurors testified they had no means of using a telephone during deliberations and that they were not aware of any

If the jury are permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or suffer themselves to be addressed by, any other

person, on any subject of the trial, and that it is their duty not to form or express an opinion thereon, until the case is finally submitted to them.

other juror doing so. All cellular telephones and pagers were turned over to the bailiffs for safekeeping. Any information jurors needed relayed to their families was conveyed through the bailiffs. The bailiffs were also called and testified about all the precautions that were taken to prevent any juror from having outside contact while deliberations were ongoing. Even Adair testified that he did not believe DeHaven because he believes DeHaven is prone to exaggeration. Based on this record, we affirm the trial court's ruling that no improper communications occurred during first stage deliberations.

¶ 10 Lastly, Matthews claims he was prejudiced because DeHaven, while still empaneled as a juror in the case, told a local bondsman that Matthews was going to "fry." The bondsman testified the two of them were joking. As discussed above, DeHaven, the alternate, was released prior to first stage deliberations and did not participate in the verdict. Moreover, there is no evidence the improper communication was conveyed to any of the actual jurors. Thus, having failed to show prejudice, Matthews' claim of error must fail and no relief is required. *See Al Mosawi v. State,* 1996 OK CR 59, ¶ 33, 929 P.2d 270, 280, *cert. denied,* 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997).

¶ 11 In his second proposition of error, Matthews claims he was denied an impartial jury on the issue of punishment because one of the jurors stated after the verdict that she had formed her opinion on punishment before the presentation of second stage evidence. As a result, Matthews asks that his death sentence be vacated, arguing a juror with a fixed preconceived opinion that the death penalty should be imposed cannot be impartial and would inevitably fail to consider the mitigating evidence and follow the court's second stage instructions.

¶ 12 At the June 28, 1999 hearing investigating juror misconduct, Juror No. 8 was

7. Hrg.06/28/99 at 76.

8. Hrg.06/28/99 at 77.

9. The trial court allowed defense counsel to make a record that he should be allowed to inquire further of Juror No. 8 to determine

questioned about any outside communication in which she may have been involved and her knowledge of any communications between Juror No. 2 and DeHaven, the alternate. Juror No. 8 testified she had not participated in any outside communications during or after first stage deliberations, but had heard Juror No. 2 say when the jury returned for second stage that she had talked with DeHaven to relay the guilty verdict. Juror No. 8 recalled Juror No. 2 saying that DeHaven had read the newspaper; however, she did not know what he had read and Juror No. 2 did not indicate that anything he read would support the verdict or somehow make them feel better about it. When asked if Juror No. 2's statements affected her punishment deliberations, Juror No. 8 stated, "Oh, no. I had already decided. When we went through that night, everything was settled in my mind."[7] Thereafter, defense counsel asked Juror No. 8 questions to clarify which verdict she was referring to as having decided. The exchange ended when defense counsel asked if Juror No. 8 meant that she had already decided what the punishment should be and she said, "Uh-huh."[8] At this point, the State objected and complained defense counsel was going beyond the scope of the hearing and attempting to have the juror impeach her verdict. The trial court agreed and limited defense counsel to questions regarding any outside information or influence that may have occurred during trial.[9]

¶ 13 Title 12 O.S.1991, § 2606(B) governs this claim and states:

Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes during deliberations. A juror may testify on the

whether or not she had an open mind on punishment during second stage. Counsel maintained that if Juror No. 8 should indicate that she did not have an open mind, Matthews would be entitled to a new trial with an impartial jury.

question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. An affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying shall not be received for these purposes.

¶ 14 Section 2606(B) was enacted to prohibit jurors from testifying post-verdict to the motives, methods or mental processes by which they reached their verdict in an effort to preserve finality of judgments and safeguard jurors from corruption by unhappy non-prevailing litigants. *Weatherly v. State,* 1987 OK CR 28, 733 P.2d 1331, 1334–35. Excluded from the rule is evidence of prejudicial extraneous information or influences being injected into the deliberative process. *Id* at 1335. Therefore, under section 2606(B), parties may only question former jurors to determine if improper and prejudicial information was revealed to the jury or any outside influence was improperly brought to bear upon any juror. *Id.* Given the law and its purpose, the trial court correctly allowed the questions concerning the existence and effect of any outside influence on Juror No. 8 and disregarded and limited Juror No. 8's testimony concerning her deliberative process. As such, we find the trial court properly ruled on Matthews' motion for new trial and deny relief.

¶ 15 In his third proposition of error, Matthews argues the trial court erred in failing to excuse five jurors [10] for cause based on their bias toward the death penalty. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Warner v. State,* 2001 OK CR 11, 29 P.3d 569. He claims questioning in *voir dire* established that each of these prospective jurors possessed an actual bias [11] necessitating dismissal for cause.

¶ 16 Trial judges enjoy "broad discretion in deciding which members of the

venire possess actual bias and should be excused for cause." *Warner,* 2001 OK CR 11, ¶ 6, 29 P.3d at 572. However, in ruling on challenges for cause, all doubts regarding juror impartiality must be resolved in favor of the accused, who need not prove a juror's bias in favor of the death penalty with unmistakable clarity. *Warner,* 2001 OK CR 11, at ¶¶ 6 & 8, 29 P.3d at 572, 573. This means trial courts should consider the entirety of a prospective juror's *voir dire* to determine if their expressed feelings favoring the death penalty would prevent or substantially impair their performance as a juror. *Warner,* 2001 OK CR 11, ¶ 8, 29 P.3d at 573. On appeal, this Court will not grant relief based on the improper denial of a challenge for cause unless the record affirmatively shows that the erroneous ruling reduced the number of the appellant's peremptory challenges to his prejudice and he must demonstrate that he was forced, over objection, to keep an unacceptable juror. *Warner,* 2001 OK CR 11, ¶ 10, 29 P.3d at 573–74. Failure to exercise all peremptory challenges waives claims of potential juror bias on appeal. *Cheatham v. State,* 1995 OK CR 32, ¶ 21, 900 P.2d 414, 422.

¶ 17 Though two of the complained of jurors expressed feelings about the death penalty that suggested an impermissible bias, Matthews cannot show prejudice from this record. The record shows Matthews removed three of the prospective jurors with his peremptory challenges and waived his ninth challenge. This left two of the complained of prospective jurors as potential alternate jurors. Matthews removed one of them, leaving DeHaven, who as discussed above did not participate in deliberations. Based on this record, Matthews cannot demonstrate prejudice and therefore he is not entitled to relief.

### FIRST STAGE ISSUES

¶ 18 In his fourth proposition, Matthews contends the trial court erred in admitting

---

10. The prospective jurors complained of are Stephen McLaughlin, Gary Weaver, Kenneth Batt, Gregory Herbster and James DeHaven.

11. "Actual bias is present when a juror's views 'prevent or substantially impair the performance of his duties as a juror in accordance with his

instruction and his oath.' " *Young v. State,* 1998 OK CR 62, ¶ 9, 992 P.2d 332, 337, *cert. denied,* 528 U.S. 837, 120 S.Ct. 100, 145 L.Ed.2d 84 (1999), *quoting Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

certain items of evidence [12] seized during the execution of a search warrant on his home. He claims the seized evidence should have been suppressed because it was obtained as a result of his illegal arrest and was therefore tainted and inadmissible. He also claims the trial court erroneously applied the inevitable discovery doctrine from *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) in admitting a pair of brown coveralls.

¶ 19 In *Matthews*, 1998 OK CR 3, ¶ 11–16, 953 P.2d at 341–43, we found that Matthews was illegally arrested and that the admission of his incriminating post-arrest statement to a law enforcement agent necessitated reversal because the statement was the product of the illegal arrest that contributed to the verdict. When the State initiated Matthews' retrial, he filed a motion to suppress the evidence seized during the search of his home, arguing it, too, was tainted by the illegal arrest and therefore should be suppressed. The validity of the search warrant and the admissibility of the seized items were litigated on March 4, 1999. The trial court issued a written ruling finding the warrant sufficient to establish probable cause and denying the motion to suppress.

¶ 20 The record shows the day after the murder Dick Frye, an investigator for the McClain County District Attorney's Office, completed a four paragraph affidavit for a search warrant on Matthews' house. Paragraph Four of the affidavit was based on information Frye gained during Matthews' illegal arrest, namely that Frye had observed a pair of brown coveralls which matched the description of a witness who observed a person wearing "those" coveralls near the murder scene around the time of the murder. At the March 4, 1999 hearing, the prosecutor conceded that Paragraph Four could not be used to determine if the affidavit provided sufficient facts to establish probable cause, but argued though the affidavit was one of the "poorest excuses for an affidavit" that he had seen in his lengthy career, it was legally sufficient. The trial court ultimately severed

Paragraph Four from the affidavit and considered only the remaining paragraphs in making its ruling. As will be discussed further in the next proposition, the trial court correctly concluded that the information Frye provided in his affidavit was sufficient to establish probable cause and that the search warrant was not so dependent on information obtained from Matthews' illegal arrest, i.e. Paragraph Four, to render it invalid thereby requiring suppression of the evidence. In addition to Paragraph Four, Frye stated that the investigation soon focused on Tracy Dyer, a known perpetrator, when phone records and investigation showed he made a telephone call from the Shorts' residence to his uncle during the burglary/murder. Dyer, in a voluntary statement, named Matthews as a co-perpetrator of the burglary/ murder. A named perpetrator who makes a statement against his own penal interest and identifies his accomplice is sufficient to establish probable cause. *See United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971)("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."); *Sockey v. State*, 1984 OK CR 48, ¶ 6, 676 P.2d 269, 271. Frye's inclusion of Dyer's admissions in the affidavit supplied the necessary facts to establish probable cause.

¶ 21 Matthews also claims the trial court erred in finding that the brown coveralls were admissible based on the doctrine of inevitable discovery. Matthews complains the trial court simply made a probable cause finding on the issuance of the warrant instead of reviewing the record provided to determine if the State proved by a preponderance of the evidence that the brown coveralls would have been inevitably discovered by lawful means as required by *Nix*. The subject coveralls were discovered during Matthews' illegal arrest in his home, but were not seized until law enforcement exe-

---

**12.** The evidence complained of consists of a medicine bottle of Xanax dated 1991 with Minnie Short's name on it found on a table in Matthews' home, three one hundred dollar bills seized from Matthews' refrigerator-freezer, two pair of Pepes jeans, one pair of Levi blue jeans, one pair of aqua and black Reebok tennis shoes found in Matthews' bathroom, one denim jacket and one pair of brown coveralls.

cuted the search warrant. In its ruling the trial court stated, "If the warrant stands, the coveralls would have been inevitably discovered as mere evidence in plain view during execution of the search warrant under *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377." Contrary to Matthews' claim, this statement does not show the trial court created a new standard or misapplied *Nix.* The court's inquiry necessarily focused on whether the warrant was valid. In order to determine if the State met its burden to show the coveralls would have been inevitably discovered by lawful means, the court had to determine if the police were lawfully in Matthews' home when they seized the coveralls that were in plain view. Because the record supports the trial court's ruling, this claim is denied.

¶ 22 In his fifth proposition, Matthews claims the evidence seized from his home should have been suppressed because the affidavit upon which the magistrate relied in issuing the search warrant contained false statements, omitted material facts and contained misleading statements knowingly made with reckless disregard for the truth in violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) and *Wackerly v. State,* 2000 OK CR 15, ¶ 13, 12 P.3d 1, 9, *cert. denied,* 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001). Consequently, Matthews maintains there was no probable cause to issue the warrant and relief is required.

¶ 23 "In *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), the Supreme Court held that an affidavit supporting a factually sufficient search warrant may be attacked upon allegations that the affidavit contained deliberate falsehoods or reckless disregard for the truth." *Wackerly,* 2000 OK CR 15, ¶ 13, 12 P.3d at 9. However, if when the inaccuracies are removed from consideration there remains in the affidavit sufficient allegations to support a finding of probable cause, the inaccuracies are irrelevant. *Id.* "To determine this issue, we ask whether the warrant would

have been issued if the judge had been given accurate information." *Gregg v. State,* 1992 OK CR 82, ¶ 19, 844 P.2d 867, 875, *citing United States v. Page,* 808 F.2d 723, 729 (10th Cir.), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987).

¶ 24 Matthews specifically complains the affiant, Dick Frye, failed to inform the magistrate of material differences between Dyer's statement and that of the surviving victim, Minnie Short, namely that Dyer had lied to police about his involvement and location during the attack.[13] Omission of this information, he argues, prevented the magistrate from effectively evaluating Dyer's credibility. He also complains Frye falsely stated that further investigation revealed Dyer and he acted in concert when Frye had no source or basis for the statement and that Frye falsely stated that Dyer made his voluntary statement to Frye when the record shows Dyer made his statement to Agent Sparks. Lastly, he complains that Dyer's statements incriminating him were not corroborated.

¶ 25 As discussed above, the trial court found the affidavit contained sufficient information to allow a neutral magistrate to find probable cause under the totality of the circumstances. In so ruling, the trial court concluded that Frye did not intentionally try to mislead the magistrate and that the omission of the discrepancies between Dyer's and Short's statement would not have materially affected the magistrate's decision in issuing the warrant because confessing perpetrators routinely minimize their own involvement. The trial court also found Frye was not trying to mislead the magistrate when he stated that Dyer made his voluntary statement to him, noting Frye had testified that his use of the term "me" included not only himself but other O.S.B.I. agents. Frye also testified he was outside the door during Dyer's interview and that the interviewing officer relayed the content of the interview to him as liaison coordinator of the case. When Dyer made his written statement, Frye was present. Based on the record provided, the

---

**13.** Dyer claimed he did not enter the house until after he heard a gunshot and that he did not injure anyone while Mrs. Short maintained two men were in the house and that the man who made the phone call cut her throat.

trial court concluded there was no police misconduct in the preparation of the affidavit, noting that a probable cause analysis properly considers the collective knowledge of facts of all the officers working on the case.

¶ 26 When reviewing the totality of the circumstances, including both allegations included in the affidavit and those which Matthews contends should have been included in the affidavit, there is no doubt but that upon being fully informed, the magistrate would still have had a substantial basis for concluding that probable cause existed. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (The standard for review for the validity of a search warrant is the totality of circumstances). *See also Lynch v. State*, 1995 OK CR 65, ¶ 18, 909 P.2d 800, 804–05 (Our duty as a reviewing Court is simply "to ensure that the magistrate had a substantial basis for concluding that probable cause existed.") The magistrate knew from the affidavit that there was more than one perpetrator and that authorities had confirmed Dyer's location at the scene through telephone records and an interview with Dyer's uncle. As noted above, by making a statement against his penal interest, there was an indicia of credibility about the remainder of Dyer's statement naming Matthews as the other perpetrator sufficient to establish probable cause. Accordingly, we find the affiant's failure to inform the magistrate of the complained of facts and his imprecise statements were not material to the finding of probable cause.

¶ 27 In his sixth proposition, Matthews alleges he was denied the reasonably effective assistance of trial counsel in violation of the Sixth Amendment. He argues trial counsel was deficient because counsel failed to: 1) cross-examine Dyer; 2) investigate available witnesses; 3) present defense witnesses crucial to his defense; and 4) object and move for mistrial or request admonishment to correct the prosecutor's improper comments.

¶ 28 To prevail on a claim of ineffective assistance of counsel, Matthews must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. *Black v. State*, 2001 OK CR 5, ¶ 65, 21 P.3d 1047, 1070, *cert. denied,* —— U.S. ——, 122 S.Ct. 483, 151 L.Ed.2d 396 (2001). *See also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Failure to prove either of the required elements is fatal to Matthews' entire claim. *Id.*

¶ 29 First, Matthews attacks counsel's failure to cross-examine Dyer about how Matthews came into possession of Mrs. Short's pill bottle and how the guns, including the murder weapon, ended up buried in a field next to Matthews' house. When called at this trial, Dyer testified that Matthews was not present and did not participate in the burglary/murder at the Shorts' residence on January 27, 1994.[14] He claimed he had lied at prior hearings when he implicated Matthews in an attempt to save himself. After the State concluded its direct examination, the defense approached the bench and asked the court if they questioned Dyer about the pill bottle and guns whether they would open the door to having the State read Dyer's prior testimony concerning the crime. The trial court advised defense counsel that if he elected to question Dyer about details, the court would allow the State to go into details as well. Defense counsel elected not to cross-examine Dyer. Under the circumstances, the decision was sound trial strategy and one we will not second-guess on appeal. *See Black*, 2001 OK CR 5, ¶ 67, 21 P.3d at 1071.

¶ 30 Matthews also claims defense counsel should have called various witnesses that Dyer had told he had wrongly accused Matthews to corroborate Dyer's trial testimony. Dyer admitted he had told all of these witnesses how he had lied and incriminated Matthews. Given this testimony, we find counsel made a sound strategic decision not to call them and no relief is required. *Id.*

14. Dyer plead guilty pursuant to a plea agreement in which he received a life sentence for Earl Short's murder and agreed to testify against Matthews at his first trial.

¶ 31 Second, Matthews complains that defense counsel should have called Michael and Grady Slay as defense witnesses. The Slays had testified at preliminary hearing that they saw Matthews at their trailer park in Purcell between 9:00 and 10:00 a.m. on January 27th. Matthews claims this testimony would have contradicted the testimony of Thomas Tucker and Dennis Hawkins that circumstantially placed him near the Shorts' at that time.[15]

¶ 32 This is not a case where counsel failed to investigate and was unaware that these witnesses existed since the Slays had testified at preliminary hearing. Matthews was represented by two seasoned lawyers, who were familiar with the content of the preliminary hearing transcript. They elected not to call the Slays and chose to focus on Dyer's exoneration of their client. Again, this decision was a strategic one and we will not second-guess it on appeal. *Id.*

¶ 33 Next, Matthews claims counsel should have called Lora Gulley to testify that his car was inoperable on the day of the murder.[16] Such testimony, he argues, would have refuted the testimony of her husband, Robert, who claimed he saw Matthews at a gas station in Wayne around 10:00 a.m. the morning of the murder paying for his gas with a wad of twenties and shaking so badly the clerk had to take the money from his hand. At trial, Gulley testified he saw Matthews and three other men at the Tom's convenience store during his morning break. Though Gulley noted he saw Matthews putting gas in "his" car, the record does not establish if it was Matthews' car or one he was borrowing. On cross-examination, Gully stated "they were in a car," not a white

pickup. At no time did Gulley describe the car or testify it was a car that belonged to Matthews. Consequently, we cannot find Matthews was prejudiced by counsel's failure to investigate and call Lora Gulley.

¶ 34 Lastly, Matthews claims he was prejudiced by counsel's failure to object to and request admonishments for the prosecutor's improper remarks. As discussed in Proposition VIII, *infra*, Matthews was not denied a fair trial by any of the alleged remarks. Therefore, he cannot show counsel was ineffective for these omissions and this claim must fail. *Spears v. State*, 1995 OK CR 36, ¶ 65, 900 P.2d 431, 445–46, *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995).

¶ 35 In his seventh proposition, Matthews claims the trial evidence was insufficient to prove beyond a reasonable doubt that he perpetrated the crimes against the Shorts because Tracy Dyer recanted his prior testimony implicating him and claimed Matthews was not present and did not participate in the crimes. In reviewing such a challenge, we must view the direct and circumstantial evidence in the light most favorable to the State, crediting all inferences that could have been drawn in the State's favor. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. *Ullery v. State*, 1999 OK CR 36, ¶ 32, 988 P.2d 332, 347. Pieces of evidence must be viewed not in isolation but in conjunction, and we must affirm the conviction so long as, from the

---

15. Tucker testified that he saw two pickup trucks, one white and one brown, near the Shorts' residence the morning of the murder around 9:30 a.m. There were two men who appeared to be trying to jump-start one of the trucks. One of the men was wearing brown coveralls similar to those recovered from Matthews' home. Hawkins had seen someone driving Mr. Short's brown pickup in a reckless manner followed by a white pickup near the Shorts' home around 9:00 a.m. Neither could identify the men they saw.

16. In conjunction with this claim Matthews filed an application for an evidentiary hearing alleging counsel failed to investigate and use available

evidence. Pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2002), Matthews has included in his application, among other affidavits, an affidavit from Lora Gulley stating she had personal knowledge that Matthews' car was inoperable on January 27, 1994. After reviewing the record, we find that an evidentiary hearing is not warranted because the application and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was deficient for failing to utilize the complained-of evidence. Accordingly, the Application for an Evidentiary Hearing is **DENIED.**

inferences reasonably drawn from the record as a whole, the jury might fairly have concluded the defendant was guilty beyond a reasonable doubt. *McGregor v. State*, 1994 OK CR 71, ¶ 8, 885 P.2d 1366, 1375, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

¶ 36 Though Dyer had a change of heart in this second trial, he had in the past named Matthews as his accomplice. Other circumstantial evidence sufficiently corroborated Dyer's first statement and connected Matthews to the crimes. Crystal Smith, Matthews' girlfriend, testified Matthews left his home with Tracy Dyer the night before the murder and did not return that night. She did not see Matthews again until lunchtime the following day. Mark Sutton testified that it was Matthews he loaned his .45 caliber Ruger to the day before Short's murder and that Matthews did not return it as agreed. The Ruger was later identified as the murder weapon and was found buried in a field next to Matthews' home. Bryan Curry testified that he drove Dyer and Matthews to the Shorts' home in December 1993 so they could burglarize it. Dyer and Matthews stole eight to ten thousand dollars from the Shorts' storm cellar. Matthews was familiar with the Shorts because they were his great aunt and uncle. Given the success of the first burglary, Matthews certainly had a motive to be the likely participant with Dyer in the instant crimes. Thomas Tucker saw two people in pickup trucks not far from the Shorts' residence around the time of the murder. He claimed one of them was wearing khaki coveralls. Mrs. Short said the shooter, not Dyer, wore khaki coveralls. Physical evidence seized from Matthews' home within two days of Short's murder, namely Mrs. Short's pill bottle, three one-hundred dollars bills and a pair of brown coveralls, was strong evidence connecting Matthews to the crimes. This evidence was sufficient for a rational trier of fact to conclude that Matthews perpetrated the crimes with Dyer beyond a reasonable doubt. As such, this claim fails.

¶ 37 In his eighth proposition of error, Matthews claims his conviction and sentence must be vacated because he was deprived of a fair trial by the prosecutor's misconduct. Matthews cites to several comments that he contends exceeded the bounds of proper prosecutorial advocacy. He claims the prosecutor improperly commented on his right to remain silent, mocked the defense theory, impermissibly vouched for the credibility of state's witnesses and attempted to unduly inflame the passions of the jury against him and defense counsel.

¶ 38 Only one of the comments of which Matthews complains was met with objection at trial. The trial court sustained the objection and thus cured any error. *See Torres v. State*, 1998 OK CR 40, ¶ 45, 962 P.2d 3, 17, *cert. denied*, 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999). As to the comments not met with objection, Matthews has waived all but plain error. *Anderson v. State*, 1999 OK CR 44, ¶ 40, 992 P.2d 409, 421, *cert. denied*, 531 U.S. 850, 121 S.Ct. 124, 148 L.Ed.2d 79 (2000). The instances cited, when read in the context of the entire closing argument, cannot truly be labeled "prosecutorial misconduct." Rather, they were the typical sort of comments made during the normal course of closing argument and as such, these instances fall within the broad parameters of effective advocacy and do not constitute error. *Wackerly*, 2000 OK CR 15, ¶ 30, 12 P.3d at 12. Having found none of the comments were made in error or were prejudicial, their combination did not prejudice Matthews or deny him a fair trial. This proposition is denied.

¶ 39 In his ninth proposition, Matthews claims the trial court erroneously admitted other crimes evidence that did not fall within one of the exceptions listed in 12 O.S.1991, § 2404(B) and was more prejudicial than probative. He specifically complains of Bryan Curry's testimony that Curry had driven Matthews and Dyer to the Shorts the month before Earl Short's murder where they burglarized the Shorts' storm cellar.

¶ 40 The State timely filed a *Burks* notice that correctly specified that the evidence of other crimes the State intended to offer against Matthews was admissible under the identity and common scheme or plan exceptions to the general prohibition against admission of other crimes evidence.

See generally *Burks v. State*, 1979 OK CR 10, ¶ 11, 594 P.2d 771, 774–75, *overruled in part on other grounds by Jones v. State*, 1989 OK CR 7, 772 P.2d 922. Matthews' participation in the prior burglary at the Shorts' with Dyer was also relevant to show motive. As discussed above, Dyer and Matthews stole eight to ten thousand dollars from the Shorts' storm cellar. Evidence of this prior burglary provided a motive for him to be the likely participant with Dyer in the instant crimes and circumstantially proved identity. It also showed a common plan to steal all of the Shorts' money they believed the Shorts kept at their residence. There was a logical connection between the introduction of this evidence and the offenses charged. We find the probative value of this evidence was not substantially outweighed by the risk of unfair prejudice. *See* 12 O.S.1991, §§ 2401 & 2403. Accordingly, we find the trial court did not abuse its discretion in admitting Curry's testimony about the prior burglary. *See Salazar v. State*, 1993 OK CR 21, ¶ 28, 852 P.2d 729, 736.

¶ 41 In his tenth proposition of error, Matthews claims the trial court erred in instructing the jury, over his objection, on the law regarding the actions and statements of co-conspirators. Matthews argues the court's instruction erroneously provided that co-conspirators are criminally responsible for all acts done by each member in furtherance of the conspiracy regardless of each member's actual knowledge of the events or statements.[17] Matthews maintains this non-uniform instruction eliminated the requirement that a conspirator must know or be aware of the scope or objective of the conspiracy.

■ ¶ 42 We have held that the responsibility of co-conspirators for the language or conduct of those acting with them is not confined to the accomplishment of the common purpose for which the conspiracy was entered into. *Johnson v. State*, 1986 OK CR 134, ¶ 8, 725 P.2d 1270, 1273. Rather, it extends to and includes all declarations made

and collateral acts done incident to and growing out of the common design when spoken or done by a co-conspirator as against all of his co-conspirators. *Id.* Moreover, "all persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals." 21 O.S.1991, § 172.

■ ¶ 43 Contrary to Matthews' claim, our case law does not require a co-conspirator to have knowledge of every act of his co-conspirator to be bound thereby. Once the agreement is made and the conspirators begin to carry-out their plan, each member is bound by the acts of his co-conspirators that are in furtherance of the conspiracy regardless of each member's actual knowledge of his co-conspirator's actions and statements. Therefore, we find the trial court's instruction fairly and accurately stated the law and no relief is required. *Phillips v. State*, 1999 OK CR 38, ¶ 73, 989 P.2d 1017, 1038, *cert. denied*, 531 U.S. 837, 121 S.Ct. 97, 148 L.Ed.2d 56 (2000)("Deviation from language of the uniform instructions constitutes technical error which is harmless if the instructions given fairly and accurately state the applicable law.")

## SECOND STAGE ISSUES

¶ 44 In his eleventh proposition of error, Matthews claims the evidence was insufficient to prove that he knowingly created a great risk of death to more than one person. He maintains the evidence was insufficient because Mrs. Short was never at a great risk of death from his act of shooting Mr. Short since she was not in the line of fire and the evidence failed to show he or Dyer intended to kill Mrs. Short since she was alive when they left the Shorts' home.

■ ¶ 45 This Court views the evidence supporting an aggravating circumstance in the light most favorable to the

---

17. Instruction 21 provided:
    You are instructed that, where a conspiracy has in fact been entered into, each of the conspirators is criminally responsible for all that is said and done by each of the members to the conspiracy, in furtherance of the conspiracy, until the purpose of the conspiracy has been fully accomplished, regardless of any actual knowledge of the events or statements. (O.R.2223)

State to determine whether any rational trier of fact could have found the facts necessary to support it beyond a reasonable doubt. *Selsor v. State*, 2000 OK CR 9, ¶ 30, 2 P.3d 344, 353, *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2002, 149 L.Ed.2d 1004 (2001). To determine if a defendant knowingly created a great risk of death to another, this Court reviews the evidence to see if the defendant's conduct endangered someone other than the deceased in close proximity, in time and intent, to the murder. *Id.* In addition, liability for this aggravating circumstance can attach for a co-defendant's act that a defendant has aided and abetted. *Selsor*, 2000 OK CR 9, ¶ 32, 2 P.3d at 353. Under these standards, the evidence here was sufficient.

¶ 46 Matthews and Dyer conspired to burglarize the Shorts. When Mrs. Short walked into the living room, Dyer grabbed her from behind and put his hand over her mouth. As she and Dyer scuffled, Mr. Short entered the room to see what was the matter. Matthews shot Mr. Short in the back of the head and Dyer threw Mrs. Short to the floor where her husband fell face down with his arm across her. At some time during the skirmish on the floor, Dyer cut her throat and choked her until Mrs. Short lost consciousness. Mrs. Short was undoubtedly at risk of death in terms of time, intent and location to Mr. Short's murder. Accordingly, we find the evidence was sufficient to show Matthews' own conduct, as well as the conduct of Dyer whom he aided and abetted, threatened the life of Mrs. Short. *See Williams v. State*, 2001 OK CR 9, ¶ 91, 22 P.3d 702, 724, *cert. denied*, ―― U.S. ――, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002). Therefore, this claim is denied.

¶ 47 Matthews also argues the great risk of death aggravating circumstance is unconstitutionally vague and overbroad. This aggravating circumstance has been found constitutional as defined and applied, and Matthews offers no new argument to challenge that conclusion. Therefore, this claim is denied. *See Selsor*, 2000 OK CR 9, ¶ 29, 2 P.3d at 353.

¶ 48 In his twelfth proposition of error, Matthews asks this Court to reconsider its prior decisions upholding the aggrava-

ting circumstance that the murder was committed by a person while serving a sentence of imprisonment on conviction when the accused was on pre-parole status rather than serving his sentence in the penitentiary. Matthews maintains this aggravating circumstance is unconstitutionally vague in this situation and fails to perform the narrowing function that is constitutionally required. This Court has consistently held, and continues to find, that this circumstance is constitutional as applied to those that the evidence shows are on pre-parole status at the time they murder the victim for the reasons stated in our prior cases. *See Humphreys v. State*, 1997 OK CR 59, ¶ 31, 947 P.2d 565, 575–76, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); *Duckett v. State*, 1995 OK CR 61, ¶¶ 80–83, 919 P.2d 7, 25–26, *cert. denied*, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997); *Cooper v. State*, 1995 OK CR 2, ¶¶ 112–117, 889 P.2d 293, 315–16, *reversed on other grounds*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *McCracken*, 1994 OK CR 68, ¶¶ 32–33, 887 P.2d at 331. As such, we find this proposition must be denied and no relief is warranted.

¶ 49 In his thirteenth proposition of error, Matthews contends that given his indigent status, his execution would violate the Constitution. He argues his sentence was impermissibly imposed in part because he is poor and could not hire experts to testify about the lack of deterrent value of the death penalty. We rejected a similar claim in *Young*, 2000 OK CR 17, ¶ 103, 12 P.3d at 46–47. We note nothing in the record suggests that his poverty contributed to the jury's conviction or sentence. The trial and sentencing were conducted in accordance with Oklahoma law. "Oklahoma's capital punishment system is constitutional and to the extent possible, assures that the death penalty will only be assessed against "criminals whose crimes set them apart from 'any other murder.'"" *Banks v. State*, 2002 OK CR 9, ¶ 40, 43 P.3d 390 *quoting Hain v. State*, 1993 OK CR 22, ¶ 11, 852 P.2d 744, 747–48, *cert. denied*, 511 U.S. 1020, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994). Accordingly, this claim is denied.

¶ 50 In his fourteenth and fifteenth propositions of error, Matthews claims his death sentence must be vacated because the mitigating evidence outweighed the evidence in aggravation and because his death sentence was the result of passion, prejudice and other arbitrary factors. He argues the jury imposed the death penalty due to the admission of unduly prejudicial and irrelevant other crimes evidence, ineffective assistance of counsel, prosecutorial misconduct and Juror No. 8's violation of her oath and duties as a juror. *See* Propositions II, VI, VIII and IX.

¶ 51 The jury was instructed on fourteen specific mitigating circumstances that were supported by the evidence.[18] By contrast, the jury found two of the three alleged aggravating circumstances, both fully supported by the evidence as explained above.[19] *See* Propositions XI and XII, *supra*. After careful review of the aggravating circumstances and the mitigating evidence, and considering the errors alleged in this appeal, we find the aggravating circumstances outweighed the mitigating circumstances. Given our resolution of the claims raised in Propositions II, VI, VIII and IX finding no error that deprived Matthews of a fair trial, we cannot say the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

¶ 52 In his sixteenth proposition, Matthews claims his death sentence must be vacated because the jury was allowed to sentence him to death without determining his culpability for Short's murder. Because separate verdict forms were not used, Matthews maintains the jury may have sentenced him to death for felony murder by his accomplice, Dyer, without making the required findings of intent or personal culpability. *Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982) (holding an individual cannot be sentenced to death for felony murder by an accomplice unless the jury finds the defendant killed the victim, intended that the victim be killed, intended that lethal force be used or acted with reckless indifference to human life).

¶ 53 The record shows otherwise. Matthews' jury was instructed that it could not impose the death penalty without finding beyond a reasonable doubt that Matthews either: "1) killed a person, 2) attempted to kill a person, 3) intended a killing to take place, 4) intended the use of deadly force, or 5) was a major participant in the felony committed and was recklessly indifferent to human life."[20] The trial evidence showed that Dyer and Matthews broke into the Shorts' home to steal more money. Dyer attacked Mrs. Short when she came into the living room, demanding to know the location of the money that had been kept in the cellar.[21] Since there were only two men involved, Matthews, by elimination, was the shooter. Matthews shot Mr. Short as he came to Mrs. Short's aid, using a home-made silencer he brought to deaden the noise. This evidence sufficiently showed Matthews fired the fatal shots, intending that lethal

---

**18.** They were: 1) the defendant did not have any significant history of prior criminal activity; 2) the defendant's capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of law was impaired; 3) the defendant was under the influence of mental/emotional disturbance; 4) the defendant is likely to be rehabilitated; 5) the defendant's age; 6) the defendant's character; 7) the defendant's emotional/family history; 8) factors existed in Jeff Matthews childhood which made it more difficult for him to develop as a normal human being; 9) Jeff Matthews was physically and emotionally abused by his father; 10) Jeff Matthews was emotionally abused by his mother and she permitted Jeff Matthews to be physically and emotionally abused by his father; 11) Jeff Matthews has a learning impairment which was undiagnosed and untreated and this contributed to

his inability to learn and adjust in school; 12) the defendant has no previous history of violent behavior; 13) the defendant is capable of being rehabilitated while in prison; and 14) the defendant has shown that he has some good qualities and has shown compassion for other human beings. (O.R.2389–90)

**19.** 1) Matthews knowingly created a great risk of death to more than one person; and (2) Matthews was serving a sentence of imprisonment when he committed the murder.

**20.** O.R. at 2381.

**21.** Matthews concedes that the evidence is undisputed that Dyer was the man who struggled with Mrs. Short and cut her throat.

924

force be used and displaying a remarkable indifference to human life. The jury's decision that Matthews' personal culpability in the attack made him eligible for the death penalty is supported by the record making his death sentence constitutional under *Enmund/Tison*. Accordingly, no relief is required.

¶ 54 In his seventeenth proposition, Matthews claims the trial court committed plain error by failing to submit separate verdict forms for malice aforethought murder and felony murder since he was charged in the alternative. He maintains he was prejudiced because the general verdict form used did not allow the jury to determine his culpability in the murder. As we discussed above, the jury was properly instructed during the sentencing stage and its decision is supported by the record. *See* Proposition XVI, *supra.* Accordingly, this claim is denied.

¶ 55 In his eighteenth proposition, Matthews asks this Court to reconsider its decisions upholding the constitutionality of the Oklahoma death penalty scheme and procedure. Because Matthews has failed to provide any compelling reason for this Court to revisit its prior decisions, this claim is denied. *Carter v. State,* 1994 OK CR 49, ¶ 54, 879 P.2d 1234, 1251, *cert. denied,* 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995) and cases cited therein.

¶ 56 In his nineteenth proposition, Matthews claims the trial court should have granted his motion to quash the Bill of Particulars because: 1) the death penalty constitutes cruel and unusual punishment; 2) the filing of a Bill of Particulars is unconstitutional because the prosecutor has complete discretion to do so and the correctness of that decision is not subject to judicial review for probable cause; and 3) Matthews should not have been exposed to the death penalty pursuant to *Enmund* and *Tison*. As discussed in Propositions XIII and XVI, *supra,* we reject the claim the death penalty is unconstitutional and constitutes cruel and unusual punishment and that Matthews' death sentence violates *Enmund/Tison*. We recently rejected the claim that filing a Bill of Particulars is unconstitutional because it is not subjected to judicial review for probable

cause because adequate guidelines exist to direct prosecutors in the capital punishment decision. *See Banks,* 2002 OK CR 9, ¶ 38, 43 P.3d 390. Accordingly, we find the trial court did not err in denying Matthews' motion to quash.

¶ 57 In his final proposition of error, Matthews contends that, even if no individual error merits reversal, the cumulative effect of the errors in his case necessitates either reversal of his conviction or a modification of his sentence. This Court has said that in the absence of individual error, there can be no accumulation of error. *Lewis v. State,* 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176, *cert. denied,* 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999). "However, when there have been numerous irregularities during the course of the trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *Id.* We have thoroughly reviewed Matthews' claims and the record in this case which reveals no error which, by itself or in combination, would justify either modification or reversal. Any irregularities or errors, even in aggregation, were harmless beyond a reasonable doubt. Therefore, no relief is required.

**MANDATORY SENTENCE REVIEW**

¶ 58 Pursuant to 21 O.S.1991, § 701.13(C), we must now determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. We addressed these issues in conjunction with our review of Propositions XI, XII, XIV and XV, *supra,* and found the death sentence was factually substantiated and appropriate. We further find no error that warrants reversal or modification. Accordingly, the Judgment and Sentence of the trial court is AFFIRMED.

LUMPKIN, P.J., JOHNSON, V.P.J., CHAPEL and LILE, JJ., CONCUR.